NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-5294

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,
CENTER FOR ENVIRONMENTAL HEALTH,
*Plaintiffs-Appellants*,

v.

LEE M. ZELDIN, in his official capacity as Administrator of the
U.S. Environmental Protection Agency,
ENVIRONMENTAL PROTECTION AGENCY,
*Defendants-Appellees*,

INHANCE TECHNOLOGIES, LLC,
*Intervenor-Appellee*.

Appeal from the United States District Court for the District of Columbia
No. 1:24-cv-02194 (Hon. James E. Boasberg)

**FEDERAL DEFENDANTS' ANSWERING BRIEF**

Of Counsel:

MAGGIE CLARK
CAMILLE HEYBOER
 *Attorneys*
Office of the General Counsel
U.S. Environmental Protection
Agency

ADAM R.F. GUSTAFSON
 *Acting Assistant Attorney General*
ROBERT N. STANDER
 *Deputy Assistant Attorney General*
ROBERT P. STOCKMAN
CHRISTOPHER ANDERSON
 *Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.    Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants.

## B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Appellants.

## C.    Related Cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

    *s/ Christopher Anderson*
Christopher Anderson

Counsel for the Federal Defendants

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases........................ i

Table of Authorities ...................................................................v

Glossary ................................................................................... ix

Introduction..............................................................................1

Statement of Jurisdiction ......................................................... 2

Statement of the Issues ............................................................ 3

Pertinent Statutes and Regulations ........................................... 3

Statement of the Case.............................................................. 4

    A.   Statutory and regulatory background ............................ 4

      1.   Requirement under section 4(f) to initiate action
         regarding substances that present a significant risk of
         serious or widespread harm................................................. 4

      2.   TSCA regulation of chemical substances and their uses
         under sections 5 and 6 ..................................................... 5

          a.   Regulation of significant new uses of chemical
             substances under section 5 .................................. 5

          b.   Regulation of chemicals and uses under
             section 6................................................................ 6

      3.   Judicial relief against imminently hazardous chemical
         substances under section 7 ............................................. 9

      4.   Citizen suits under section 20........................................10

      5.   Citizen petitions under section 21................................... 11

    B.   Factual background ......................................................... 11

1. Fluorinated containers and PFAS.................................... 11

2. PFAS significant new use rule and orders issued to
   Inhance under TSCA section 5......................................13

3. Plaintiffs request, and EPA initiates, action under
   TSCA section 6 ...................................................14

C. District court proceedings ............................................15

Summary of Argument .....................................................18

Standard of Review...........................................................20

Argument .......................................................................20

I.    Plaintiffs' section 4(f) claim is moot. ............................... 20

   A. The only relief available in a nondiscretionary duty suit
      is an order requiring EPA to take the nondiscretionary
      action. ......................................................................21

   B. EPA "initiated applicable action" by beginning the
      analysis required under section 6. ................................. 22

   C. Plaintiffs' counterarguments fail..................................... 25

   D. EPA's reading of section 4(f) would not allow the Agency
      to "indefinitely ignore" significant risks..........................33

II.   The district court correctly held that EPA does not have a
      nondiscretionary duty under section 7................................ 35

   A. Any duty imposed by section 7(a)(2) is not enforceable
      in a mandatory duty suit because TSCA imposes no
      deadline on EPA. ........................................................ 36

   B. Any duty imposed by Section 7(a)(2) would only follow
      proposal of a section 6 rule............................................38

III.  Plaintiffs lack Article III standing. .................................. 42

Conclusion ................................................................. 49

Certificate of Compliance ............................................. 50

# TABLE OF AUTHORITIES

**Cases**

*Center for Biological Diversity v. Department of the Interior*,
144 F.4th 296 (D.C. Cir. 2025) ..................................................... 20

*Center for Environmental Health v. Regan*,
103 F.4th 1027 (4th Cir. 2024) ............................................. 10, 21

*Clean Wisconsin v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) ................................................. 44

*Coalition for Mercury-Free Drugs v. Sebelius*,
671 F.3d 1275 (D.C. Cir. 2012) ................................................. 45

*Da Costa v. Immigration Investor Program Office*,
80 F.4th 330 (D.C. Cir. 2023) ................................................... 22

*Environmental Defense Fund v. Gorsuch*,
713 F.2d 802 (D.C. Cir. 1983) ................................................... 21

*Exxon Mobil Corp. v. Allapattah Services, Inc.*,
545 U.S. 546 (2005) .................................................................. 41

*FBI v. Fikre*,
601 U.S. 234 (2024) .................................................................. 20

*Flyers Rights Education Fund, Inc. v. Department of Transportation*,
957 F.3d 1359 (D.C. Cir. 2020) ................................................ 44

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) .............................................. 43, 44, 45, 48

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ............................................ 46, 48

*Heckler v. Chaney*,
470 U.S. 821 (1985) .................................................................. 42

*Inhance Technologies, LLC v. EPA*,
96 F.4th 888 (5th Cir. 2024) ..................................... 13, 14, 22

*Kim v. United States,*
  632 F.3d 713 (D.C. Cir. 2011) ................................................... 20

*Kingdomware Technologies, Inc. v. United States,*
  579 U.S. 162 (2016) ................................................................ 41

*Klayman v. Porter,*
  104 F.4th 298 (D.C. Cir. 2024) ................................................ 43

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ........................................................... 43, 46

*Mexichem Specialty Resins, Inc. v. EPA,*
  787 F.3d 544 (D.C. Cir. 2015) ................................................. 10

*Natural Resources Defense Council v. EPA,*
  464 F.3d 1 (D.C. Cir. 2006) .................................................... 46

*Natural Ressources Defense Council v. Train,*
  510 F.2d 692 (D.C. Cir. 1974) ............................................ 10, 21

*Norton v. Southern Utah Wilderness Alliance,*
  542 U.S. 55 (2004) ................................................................. 21

*Telecommunications Research & Action Center v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984) .................................................. 34

*Sierra Club v. EPA,*
  754 F.3d 995 (D.C. Cir. 2014) ................................................ 46

*Sierra Club v. Thomas,*
  828 F.2d 783 (D.C. Cir. 1987) ......................... 10, 17, 34, 36, 37

*Sierra Club v. Wheeler,*
  956 F.3d 612 (D.C. Cir. 2020) ...................................... 10, 36, 42

*Southwest Airlines Co. v. Saxon,*
  596 U.S. 450 (2022) .............................................................. 34

*Tenaska Clear Creek Wind, LLC v. FERC,*
  108 F.4th 858 (D.C. Cir. 2024) ............................................... 20

*Virginia Uranium v. Warren,*
  587 U.S. 761 (2019) .............................................................. 30

## Statutes

15 U.S.C. § 2601 ................................................................ 4

15 U.S.C. § 2603(f) ............................... 4, 16, 21, 24−29, 30, 37

15 U.S.C. § 2604(a) ......................................................... 5, 6

15 U.S.C. § 2604(e) ............................................................ 32

15 U.S.C. § 2604(f) ............................................................ 32

15 U.S.C. § 2605(a) ......................... 6, 7, 8, 10, 26, 28, 29, 32

15 U.S.C. § 2605(b)(4)(A) ............................................... 6, 32

15 U.S.C. § 2605(b)(4)(F) .................................................... 7

15 U.S.C. § 2605(b)(4)(G) ................................................ 7, 30

15 U.S.C. § 2605(b)(4)(H) ................................................ 7, 33

15 U.S.C. § 2605(c)(1) .................................................. 9, 30, 33

15 U.S.C. § 2605(c)(2) ...................... 8, 9, 23, 24, 28, 30, 32, 33

15 U.S.C. § 2605(d) ........................... 10, 24, 28, 38, 39, 40

15 U.S.C. § 2606(a) ................................................ 9, 10, 36−40

15 U.S.C. § 2606(f) ............................................................. 9

15 U.S.C. § 2608 .............................................................. 8

15 U.S.C. § 2618 .............................................................. 35

15 U.S.C. § 2619(a)(2) ................................................ 2, 10, 16

15 U.S.C. § 2620 ............................................................... 11

15 U.S.C. § 2625 ............................................................... 7

28 U.S.C. § 1291 .............................................................. 3

## Rules

Federal Rule of Appellate Procedure 4 ................................. 3

Federal Rule of Civil Procedure 12(b) ................................. 20

## Regulations

40 C.F.R. pt. 702, subpt. B ................................................................. 6

40 C.F.R. § 702.39(a) ........................................................................ 6

40 C.F.R. § 702.41 ............................................................................. 7

40 C.F.R. § 702.43(c).......................................................................... 7

40 C.F.R. § 721.10536 ........................................................................13

40 C.F.R. § 721.25.............................................................................. 5

## Other Authorities

85 Fed. Reg 45109 (July 27, 2020). ....................................................13

89 Fed. Reg. 79581 (Sept. 30, 2024)...................................................15

H.R. Report No. 94-1679 ................................................................... 4

*Webster's Third New International Dictionary* (1976) ............................. 23

# GLOSSARY

EPA               Environmental Protection Agency

TSCA           Toxic Substances Control Act

PFAS           Per- and polyfluoroalkyl substances

PFNA           Perfluorononanoic acid

PFOA           Perfluorooctanoic acid

PFDA           Perfluorodecanoic acid

# INTRODUCTION

The plastics commonly used to manufacture bottles and other containers are permeable, meaning that their contents can volatilize and escape through the wall of the container. One way to make plastic containers less permeable is fluorination, in which formed containers are exposed to fluorine gas in a heated chamber. The fluorination process has been in use for decades, but only in recent years has the U.S. Environmental Protection Agency (EPA) received information that the process may also generate certain per- and polyfluoroalkyl substances (PFAS) as a byproduct and that those PFAS may leach into the containers' contents. PFAS are a class of thousands of potentially persistent and bioaccumulative chemical compounds, some of which may be carcinogenic or have other harmful effects. EPA responded to that information by issuing orders under section 5 of the Toxic Substances Control Act (TSCA) banning manufacture of PFAS in the fluorination of plastic containers. But the Fifth Circuit vacated those orders after concluding that the fluorination process is an existing use not subject to section 5.

After the Fifth Circuit issued its decision, Plaintiffs, Public Employees for Environmental Responsibility and the Center for Environmental Health, petitioned EPA to promulgate a rule under TSCA section 6 prohibiting the

production of certain PFAS during the fluorination of containers. EPA granted the petition and agreed to commence a proceeding under section 6 but did not commit to a particular regulatory outcome.

Dissatisfied, Plaintiffs sued, alleging that EPA had nondiscretionary duties under two different provisions of TSCA. Shortly thereafter, EPA initiated a section 6 proceeding to address the risks that may be posed by certain PFAS produced during the fluorination of containers.

The district court held that EPA's initiation of a section 6 proceeding fulfilled any nondiscretionary duty EPA may have had under the first provision of TSCA relied on by Plaintiffs and dismissed their claim under that section as moot. The court then held that Plaintiffs' complaint did not allege facts showing that EPA's duties under the second provision had been triggered and dismissed that claim as well.

The plain language of TSCA shows that the district court's rulings were correct, and Plaintiffs' arguments on appeal amount to little more than a plea to ignore TSCA's text in pursuit of Plaintiffs' understanding of the statute's purpose. The Court should reject Plaintiffs' arguments and affirm.

## STATEMENT OF JURISDICTION

The district courts have subject matter jurisdiction over TSCA citizen suits under 15 U.S.C. § 2619(a)(2). But the district court correctly held that it

lacked jurisdiction because Plaintiffs' claim under section 4(f) of TSCA is moot and because Plaintiffs' claim under section 7(a)(2) falls outside any applicable waiver of sovereign immunity. Alternatively, the district court lacked jurisdiction because Plaintiffs lack Article III standing.

The district court entered a final judgment dismissing the complaint on December 11, 2024. JA193. Plaintiffs filed a timely notice of appeal on December 26, 2024. JA206; *see also* Fed. R. App. P. 4(a)(1)(B). This court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly held that Plaintiffs' claim under TSCA section 4(f) is moot because the court could not award Plaintiffs any effective relief.

2.     Whether the district court correctly held that it lacked jurisdiction over Plaintiffs' claim under TSCA section 7(a)(2) because the claim falls outside any applicable waiver of sovereign immunity or, alternatively, that Plaintiffs fail to state a claim under that section.

3.     Whether Plaintiffs lack Article III standing.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.     Statutory and regulatory background

Congress enacted TSCA in 1976 to protect human beings and the environment from chemical substances that "may present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601(a)(2). Under TSCA, EPA regulates "chemical substances and mixtures ... whose manufacture, processing, distribution in commerce, use, or disposal may present an unreasonable risk" under their conditions of use.[1] *Id.*

#### 1.     Requirement under section 4(f) to initiate action regarding substances that present a significant risk of serious or widespread harm

TSCA section 4(f) provides that "[u]pon the receipt of ... information" that indicates to EPA "that there may be a reasonable basis to conclude that a chemical substance or mixture presents a significant risk of serious or widespread harm to human beings," EPA must within 180 days, subject to a 90-day good-cause extension, either "initiate applicable action under [section 5, 6, or 7]" or publish a notice in the Federal Register explaining why that risk is not unreasonable. *Id.* § 2603(f).

_____

[1] For simplicity, this brief uses "manufacture" to mean "manufacture, processing, distribution in commerce, use, or disposal," unless otherwise stated.

### 2. TSCA regulation of chemical substances and their uses under sections 5 and 6

In broad terms, TSCA authorizes EPA to regulate new chemical substances and significant new uses of chemicals under section 5, *id*. § 2604, and existing chemical substances under section 6, *id*. § 2605. Those sections provide distinct procedures and standards for the regulation of the chemical substances and conditions of use to which they apply.

### a. Regulation of significant new uses of chemical substances under section 5

Section 5 generally prohibits (with exceptions not relevant to this case) any person from manufacturing a new chemical substance or from manufacturing a chemical substance for a "significant new use" without prior notice to and review by EPA. *Id*. § 2604(a)(1)(A)–(B). EPA determines that a use is a "significant new use" through notice and comment rulemaking. *Id*. § 2604(a)(2). Once a "significant new use rule" becomes effective, no person may manufacture the chemical substance for those uses until that person submits a notice to EPA, EPA reviews the notice, and EPA makes a risk determination regarding the manufacture of the chemical substance for those uses. *Id*. § 2604(a); 40 C.F.R. § 721.25. If EPA finds that a significant new use of a chemical substance presents an unreasonable risk of injury or determines that there is insufficient evidence to evaluate the effects of such use,

then EPA must take action to prohibit or limit the manufacture of the chemical substance for that use. 15 U.S.C. § 2604(a)(3), (e), (f).

### b.    Regulation of chemicals and uses under section 6

EPA may regulate chemical substances under section 6, which prescribes a detailed process for evaluating whether a chemical substance "presents an unreasonable risk of injury to health or the environment … under the conditions of use" and for developing risk management measures "to the extent necessary so that the chemical substance or mixture no longer presents such risk." *Id*. § 2605(a), (b)(4)(A).

The section 6 process includes a risk evaluation "to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors … under the conditions of use." *Id*. § 2605(b)(4)(A). Section 6 risk evaluations are subject to an array of statutory requirements and procedural regulations established by EPA. *Id*. § 2605(b)(4); *see also* 40 C.F.R. pt. 702, subpt. B (specifying risk evaluation procedures). A section 6 risk evaluation has multiple components, including a scope, a hazard assessment, an exposure assessment, a risk characterization, and a risk determination, 40 C.F.R. § 702.39(a), and must "integrate and assess available information," 15 U.S.C.

§ 2605(b)(4)(F)(i), be conducted "in a manner consistent with the best available science," *id.* § 2625(h), and be "based on the weight of the scientific evidence," *id.* § 2625(i). Section 6 risk evaluations generally undergo peer review activities, 40 C.F.R. § 702.41, and EPA must "provide no less than 30 days public notice and an opportunity for comment on a draft risk evaluation prior to publishing a final risk evaluation," 15 U.S.C. § 2605(b)(4)(H); *see also* 40 C.F.R. § 702.43(c) (establishing a 60-day public notice period for section 6 risk evaluations). Risk evaluations must generally be completed within three years, but EPA may extend that deadline for an additional six months. *Id.* § 2605(b)(4)(G).

If EPA determines in a risk evaluation conducted under section 6(b) that the manufacture of a chemical substance "presents an unreasonable risk of injury to health or the environment," EPA must "by rule" apply one or more risk management measures "to the extent necessary so that the chemical substance or mixture no longer presents such risk." *Id.* § 2605(a). Risk management measures can include a prohibition or restriction on the manufacture of the chemical substance, a requirement that the chemical substance carry warnings and instructions, regulations on the commercial use or disposal of the chemical substance, or record keeping requirements,

among other possible measures. *Id*. § 2605(a)(1)–(7). Under certain circumstances, EPA may satisfy its obligation by referring risk management to another EPA program or a relevant federal agency. *Id*. § 2608(a)–(b).

When proposing and promulgating a section 6(a) risk management rule, EPA must consider and publish a "Statement of Effects" that considers (i) the effects of the chemical substance on human health and the magnitude of human exposure, (ii) the effects of the chemical substance on the environment and the magnitude of environmental exposure, (iii) the benefits of the chemical substance for various uses, (iv) and the reasonably ascertainable economic consequences of the rule. *Id*. § 2605(c)(2)(A). Regarding the economic consequences of the rule, the Statement of Effects must specifically address "the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health," as well as the costs and benefits and cost effectiveness of the proposed regulatory action and one or more primary alternative regulatory actions. *Id*. § 2605(c)(2)(A)(iv). When selecting risk management measures to be included in a section 6(a) rule, EPA must factor in, to the extent practicable, the considerations analyzed in the Statement of Effects. *Id*. § 2605(c)(2)(B). If EPA proposes "to prohibit or restrict in a manner that substantially prevents a specific condition of use" of a chemical substance, it must consider,

to the extent practical, whether alternatives that benefit health or the environment will be reasonably available as a substitute for the regulated chemical substance. *Id.* § 2605(c)(2)(C).

EPA must propose risk management measures in a section 6(a) rule within one year of the date EPA determines that a chemical substance presents an unreasonable risk under its conditions of use in a final risk evaluation, and EPA must issue a final rule within two years of the date of the final risk evaluation. *Id.* § 2605(c)(1). EPA may extend those deadlines for a combined total of up to two years. *Id.* § 2605(c)(1)(C).

### 3. Judicial relief against imminently hazardous chemical substances under section 7

Under section 7(a)(1), EPA has the discretion to commence a civil action in district court to seize "imminently hazardous" chemical substances, mixtures, or articles containing them, and to obtain injunctive relief against any person who manufactures, processes, distributes in commerce, uses, or disposes of them. *Id.* § 2606(a)(1). A chemical substance is "imminently hazardous" if it "presents an imminent and unreasonable risk of serious or widespread injury to health or the environment." *Id.* § 2606(f).

Section 7(a)(2) addresses the specific situation in which EPA has proposed a section 6(a) rule to regulate a chemical substance and has identified that substance as presenting an imminent hazard but has not exercised its

discretion to make that rule immediately effective pending public comment and finalization as authorized by section 6(d)(3)(i). Specifically, section 7(a)(2) provides that if EPA "has not made a rule under section 2605(a) of this title immediately effective (as authorized by section 2605(d)(3)(A)(i) of this title) with respect to an imminently hazardous chemical substance," then EPA "shall commence [a civil action under section 7(a)(1)] … with respect to such substance." *Id*. § 2606(a)(2).

### 4. Citizen suits under section 20

Section 20 authorizes any person to bring suit "against [EPA] to compel [the Agency] to perform any act or duty under [TSCA] which is not discretionary." *Id*. § 2619(a)(2). Such "nondiscretionary duty" suits may be brought only if another provision of TSCA expressly requires EPA to take a specific action by a "date-certain deadline," leaving the Agency with no discretion. *See Sierra Club v. Thomas*, 828 F.2d 783, 790–91 (D.C. Cir. 1987) *other holdings superseded by statute as stated in Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 553 n.6 (D.C. Cir. 2015); *see also Sierra Club v. Wheeler*, 956 F.3d 612, 616 (D.C. Cir. 2020). In such cases, the district courts are empowered only to establish an enforceable deadline for EPA to take the statutorily required action. *See Natural Res. Def. Council v. Train*, 510 F.2d 692, 705 (D.C. Cir. 1974); *see also Ctr. for Env't Health v. Regan*,

103 F.4th 1027, 1038 (4th Cir. 2024) (applying that principle in the TSCA citizen suit context).

### 5. Citizen petitions under section 21

Section 21 authorizes any person to petition EPA to "initiate a proceeding for the issuance, amendment, or repeal" of a section 6 rule. 15 U.S.C. § 2620(a). EPA is required to respond to the petition within ninety days. *Id.* § 2620(b)(3). If EPA grants the petition, it must "promptly commence an appropriate proceeding" under section 6. *Id.*

### B. Factual background

### 1. Fluorinated containers and PFAS

PFAS are a diverse class of thousands of manufactured chemicals that have been used in industrial and consumer applications since the 1940s.[2] Plaintiffs allege that PFAS are highly persistent in the environment and are bioaccumulative, meaning that concentrations of those PFAS in organisms build over time. JA9, 23–24 (Compl. ¶¶ 6, 76). Plaintiffs further allege that PFAS have been linked to a number of health effects including adverse reproductive and developmental effects and cancer. JA26 (Compl. ¶ 89). Perfluorooctanoic acid (PFOA) is among the most-studied PFAS and, according

---

[2] U.S. EPA, *PFAS Explained*, available at: https://www.epa.gov/system/files/documents/2023-10/final-virtual-pfas-explainer-508.pdf.

to Plaintiffs, is among the most harmful of known PFAS. JA9, 25 (Compl. ¶¶ 6, 80–82).

Plaintiffs assert that Inhance Technologies, LLC (Inhance) is the only company in the United States that offers fluorination for plastic containers. JA189 (Bennett Decl. ¶ 22 (Oct. 10, 2024)). During that process, fluorine gas is applied to plastic containers under high temperatures to decrease the containers' permeability. JA18 (Compl. ¶ 52). Fluorinated containers are used for a variety of consumer and industrial products and applications, including pesticides, cleaning products, fuel tanks, and storage containers. JA18 (Compl. ¶ 54). Plaintiffs allege that Inhance fluorinates around 200 million containers per year. JA18 (Compl. ¶ 53).

In addition to improving the impermeability of the treated containers, Plaintiffs allege that the fluorination process creates several PFAS, including PFOA, as a byproduct. JA19 (Compl. ¶¶ 56, 60). Plaintiffs allege that the PFAS created remain on the walls of the container. JA19 (Compl. ¶ 57). Once the fluorinated containers are filled, PFAS can leach into their contents. JA20 (Compl. ¶ 63). Thus, according to Plaintiffs, humans can be exposed to PFAS either by handling fluorinated containers or by coming into contact with substances stored in them. JA30 (Compl. ¶ 103).

### 2. PFAS significant new use rule and orders issued to Inhance under TSCA section 5

On July 27, 2020, EPA finalized a significant new use rule under TSCA section 5 for specific categories of long-chain PFAS, including PFOA. 85 Fed. Reg. 45,109 (July 27, 2020), codified at 40 C.F.R. § 721.10536; *see also Inhance Technologies, LLC v. EPA,* 96 F.4th 888, 892 (5th Cir. 2024). That rule requires notice to EPA and review before the manufacture or processing of the designated PFAS for any new use.

In 2021, EPA became aware that Inhance's fluorination process produces long-chain PFAS, including PFOA, as byproducts. JA19–20 (Compl. ¶¶ 61–62). EPA issued a notice of violation to Inhance in March 2022 notifying the company that its manufacture of those long-chain PFAS violated TSCA section 5 and the July 2020 significant new use rule. Inhance agreed to submit significant-new-use notices for certain PFAS but refused to stop production. JA22 (Comp. ¶ 68); *see Inhance,* 96 F.4th at 892.

EPA subsequently determined, pursuant to section 5(a)(3), that certain PFAS produced by Inhance's fluorination process present, and that others may present, an unreasonable risk of injury to human health and the environment. JA23 (Compl. ¶¶ 73–75); *see also Inhance,* 96 F.4th at 892. EPA therefore issued orders to Inhance under section 5 requiring the company to

stop manufacturing those PFAS. JA23 (Compl. ¶¶ 74–75). Before those orders went into effect, Inhance sought judicial review in the U.S. Court of Appeals for the Fifth Circuit, which vacated the orders in March 2024. The Fifth Circuit concluded that Inhance's fluorination process is not a "new" use within the meaning of section 5 and therefore is not subject to the significant new use rule. *Inhance*, 96 F.4th at 895–96. The Fifth Circuit noted, however, that EPA can regulate Inhance's fluorination process under section 6. *Id.* at 895.

### 3. Plaintiffs request, and EPA initiates, action under TSCA section 6

Less than a month after the Fifth Circuit vacated the section 5 orders, Plaintiffs, among others, petitioned EPA to issue a rule under section 6 to prohibit the manufacture of three PFAS (PFOA, PFNA, and PFDA) during the fluorination of plastic containers. EPA granted that petition on July 10, 2024, stating that:

> The agency will promptly commence an appropriate proceeding under TSCA Section 6 associated with the formation of PFOA, PFNA, and PFDA during the fluorination of plastic containers. As part of that proceeding, the EPA intends to request information, including the number, location, and uses of fluorinated containers in the United States; alternatives to the fluorination process that generates PFOA, PFNA, and PFDA; and measures to address risk from PFOA, PFNA, and PFDA formed during the fluorination of plastic containers.

JA40 (Petition Response Letter 4).

EPA followed through on that commitment by initiating a section 6 proceeding in September 2024. It did so by issuing a Request for Comment seeking the information identified in the Petition Response Letter and opening a public docket for submitting that information. JA42–46 (Request for Comment). The Request for Comment was published in the Federal Register on September 30, 2024. 89 Fed. Reg. 79581.

## C. District court proceedings

Plaintiffs filed this suit on July 25, 2024, just two weeks after EPA granted their rulemaking petition. In their complaint, Plaintiffs alleged that EPA failed to perform mandatory duties under TSCA sections 4(f) and 7(a)(2). Shortly thereafter, Inhance moved to intervene as a defendant.[3]

After EPA published the Request for Comment and opened a publicly accessible, online docket, the Agency moved to dismiss Plaintiffs' section 4(f) claim arguing that EPA had "intiat[ed] applicable action" under section 6 and therefore fulfilled any nondiscretionary duty under section 4(f). As a result, the district court could no longer award Plaintiffs effective relief and the

---

[3] After it dismissed Plaintiffs' claims, the district court denied Inhance's motion to intervene as moot. JA205. Inhance appealed from the denial of intervention (D.C. Cir. Case No. 25-5015) and moved in this Court to intervene as a defendant in Plaintiffs' appeal. On April 22, 2025, this Court granted Inhance's motion to intervene in Plaintiffs' appeal and dismissed Inhance's appeal of the denial of intervention.

claim was moot. EPA also moved to dismiss the section 7(a)(2) claim because any duties under that provision do not arise until EPA proposes a section 6 rule and because section 7(a)(2) contains no deadline by which EPA must act. Accordingly, EPA had no nondiscretionary duty under section 7(a)(2), and Plaintiffs' claim fell outside TSCA's waiver of sovereign immunity for suits to compel EPA to perform any act that is not discretionary. *See* 15 U.S.C. § 2619(a)(2). Alternatively, EPA argued that the section 7(a)(2) claim should be dismissed for failure to state a claim upon which relief can be granted.

The district court agreed and dismissed the case. Beginning with the section 4(f) claim, the court first determined that EPA had a nondiscretionary duty to act no later than 180 days after March 29, 2023, the date on which Plaintiffs allege that EPA was in receipt of information that there may be a reasonable basis to conclude that PFOA produced in the fluorination process "presents a significant risk of serious or widespread harm to human beings." JA200 (Op. 7) (quoting 15 U.S.C. § 2603(f)). The court then found that EPA discharged that duty by publishing the Request for Comment, which initiated applicable action under section 6 because it was "explicitly designed to inform the Agency's regulation of the relevant PFAS." JA201 (Op. 8) (internal quotation marks and alterations omitted). Accordingly, the district court

held that it lacked the power to award Plaintiffs effective relief on their section 4(f) claim and that the claim was therefore moot. JA202 (Op. 9). Alternatively, the court held that to the extent Plaintiffs sought an order requiring EPA to do more than initiate applicable action, that request went beyond the relief available under TSCA and therefore failed to state a claim for relief. JA202 (Op. 9).

Turning to the section 7(a)(2) claim, the district court expressed doubt that section 7(a)(2) imposes a nondiscretionary duty at all "given the lack of a deadline that is 'date-certain' or 'readily-ascertainable by reference to some other fixed date or event.'" JA203 (Op. 10 (quoting *Sierra Club v. Thomas*, 828 F.2d at 790–91)). But even assuming that section 7(a)(2) does impose a nondiscretionary duty, the court ruled that no such duty had arisen in this case because that duty is triggered only after EPA proposes a section 6 rule but declines to make the rule immediately effective. JA203–04 (Op. 10–11). The court therefore dismissed the section 7(a)(2) claim for lack of jurisdiction because it fell outside the limited waiver of sovereign immunity in TSCA's citizen suit provision. JA204 (Op. 11). Alternatively, the court held that the claim should be dismissed for failure to state a claim upon which relief could be granted. JA204 (Op. 11).

## SUMMARY OF ARGUMENT

The district court correctly dismissed Plaintiffs' section 4(f) claim as moot. When EPA receives information that a chemical substance may present a significant risk of serious or widespread harm to human beings, section 4(f) requires the Agency to "initiate applicable action under section [4, 5, or 6 of TSCA] to prevent or reduce to a sufficient extent such risk" or publish a finding that such risk is not unreasonable. Plaintiffs' complaint alleged that EPA was in receipt of information that PFOA produced during the fluorination of containers may present an unreasonable risk and that section 4(f) therefore imposed a nondiscretionary duty on EPA to act. After Plaintiffs sued, EPA initiated action under section 6 to address risks that may be posed by the production of PFAS during the fluorination of containers. By doing so, EPA discharged any nondiscretionary duty it may have had under section 4(f). Accordingly, the district court lacked the power to award Plaintiffs any relief on their section 4(f) claim, and the court correctly dismissed the claim as moot.

The district court also correctly dismissed Plaintiffs' claim under section 7(a)(2). That provision contains no date-certain or readily ascertainable deadline by which EPA must act, and therefore any duties that section imposes on EPA are not actionable in a nondiscretionary duty suit. But even if

a deadline could be inferred from other provisions of TSCA (which it cannot), Plaintiffs' section 7(a)(2) claim must still be dismissed. To the extent section 7(a)(2) requires EPA to act, that requirement only applies when EPA proposes a rule under section 6(a) to address risks posed by an imminently hazardous substance but declines to make that rule immediately effective. As Plaintiffs acknowledge, EPA has not proposed any section 6(a) rule regarding PFAS produced during the fluorination of containers. Accordingly, EPA presently has no nondiscretionary duty under section 7(a)(2).

The case must also be dismissed for another reason: Plaintiffs lack Article III standing. Plaintiffs assert that their employees are harmed because there is a risk they will be exposed in the future to PFAS from containers fluorinated by Inhance. But Plaintiffs' allegations do not show that fluorinated containers comprise a significant fraction of all plastic containers placed on the market, and Plaintiffs acknowledge that they can only identify classes of products that *may* use fluorinated containers. Plaintiffs therefore fail to plausibly allege that there is a substantial probability that their employees will be exposed to fluorinated containers in the future, as required to establish a cognizable injury. Plaintiffs therefore lack Article III standing.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's order dismissing a case for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or for failure to state a claim under Rule 12(b)(6). *Kim v. United States*, 632 F.3d 713, 715 (D.C. Cir. 2011).

At the motion to dismiss stage, the Court accepts as true Plaintiffs' well-pleaded factual allegations and draws reasonable factual inferences in favor of Plaintiffs. *Ctr. for Biological Diversity v. Dep't of the Interior*, 144 F.4th 296, 303 (D.C. Cir. 2025).

## ARGUMENT

## I.    Plaintiffs' section 4(f) claim is moot.

A case becomes moot, and ceases to be a justiciable case or controversy, if the district court is no longer able to award meaningful relief. *Tenaska Clear Creek Wind, LLC v. Fed. Energy Regul. Comm'n*, 108 F.4th 858, 867 (D.C. Cir. 2024). The burden of establishing mootness is on the defendant. *FBI v. Fikre*, 601 U.S. 234, 241 (2024). The district court held that Plaintiffs' section 4(f) claim is moot because EPA has already taken the only action required by that provision, and the court was therefore unable to award Plaintiffs any relief. JA202 (Op. 9). That holding was correct and should be affirmed.

### A. The only relief available in a nondiscretionary duty suit is an order requiring EPA to take the nondiscretionary action.

In a nondiscretionary duty suit, the only relief a court may award is an order imposing a deadline on the defendant agency to perform the nondiscretionary duty. *Ctr. for Env't Health*, 103 F.4th at 1038 (holding, in a TSCA citizen suit, that when statutory text requires EPA only to "*initiate a proceeding* for the issuance of a rule or an order," that "all the district court can provide … is an order directing the EPA to initiate a proceeding for a rule or order"); *Env't Def. Fund v. Gorsuch*, 713 F.2d 802, 812–13 (D.C. Cir. 1983); *Natural Res. Def. Council*, 510 F.2d at 705; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ("[T]he only agency action that can be compelled under the APA is action legally *required*.")

Thus, assuming the truth of Plaintiffs' allegation that EPA had a reasonable basis to conclude that the PFAS formed during the fluorination of containers present a significant risk of serious or widespread harm, the only relief the district court could award would be an order requiring EPA to "initiate applicable action" under TSCA section 5, 6, or 7. 15 U.S.C. § 2603(f)(2); *see also* JA202 (Op. 9). The question therefore is whether EPA "initiat[ed] applicable action" under section 6 by opening a publicly accessible docket and publishing the Request for Comment. If it did, then the district court was

correct that it was without power to order additional relief, and the case is moot.[4] *See Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023) (holding that an unreasonable delay suit became moot when the agency took the action required by the relevant statute).

### B. EPA "initiated applicable action" by beginning the analysis required under section 6.

As Plaintiffs apparently concede, Br. 16, EPA first initiated action to address the risk from Inhance's fluorination process in December 2023 when it issued orders to Inhance under Section 5(f), which discharged any duty imposed on EPA by section 4(f). Although the Fifth Circuit subsequently vacated those orders in March 2024, *see Inhance Technologies,* 96 F.4th at 895–96, EPA has continued to take action under TSCA to address concerns related to the fluorination of containers, as described above, pp. 14–15. Thus, EPA had no unfulfilled duty under section 4(f) even as of the date Plaintiffs filed suit. But even if the vacatur of the section 5 orders meant that EPA then had a new duty to initiate applicable action under a different section of TSCA,

---

[4] For purposes of this appeal, EPA assumes, as alleged in Plaintiffs' complaint, that it was in receipt of information indicating "that there may be a reasonable basis to conclude that a chemical substance or mixture presents a significant risk of serious or widespread harm to human beings" no later than March 29, 2023. JA31–32 (Compl. ¶¶ 111, 113). EPA also assumes, without conceding, that section 4(f) imposed a mandatory duty on EPA to initiate applicable action within 180 days of that date.

EPA took such action in September 2024 when it initiated action under section 6.

EPA again initiated applicable action under section 6 by publishing the Request for Comment and opening a publicly accessible docket. As the district court observed, the Request for Comment "was explicitly designed to inform the Agency's regulation of the relevant PFAS" under section 6. JA201 (Op. 8) (quotation marks and alterations omitted). It therefore initiated applicable action by "kickstarting the information-gathering process" necessary to complete the analyses required under that section. JA201 (Op. 8).

"Initiate" means "to begin or set going … perform or facilitate the first actions, steps, or stages of." *Webster's Third New International Dictionary* (1976). To propose a rule under section 6(a), EPA must prepare multiple analyses, including an economic analysis and an alternatives analysis. *See* 15 U.S.C. § 2605(c)(2)(A)(iv) (economic analysis), (c)(2)(C) (consideration of alternatives). Those preliminary analyses are the "first steps of" the rule-making process.[5] But they do not spring from the Agency fully formed, like

_____

[5] EPA does not concede that, under section 4(f), the "applicable action" for section 6 is necessarily rulemaking (as opposed to, for example, prioritization or risk evaluation). However, in this case the Court need not reach this statutory question because EPA already agreed to initiate an "appropriate proceeding" to issue a rule under section 6(a) in response to Petitioner's section 21 petition. *See* JA39.

Athena from Zeus's brow. Instead, EPA may need to collect and evaluate information to prepare those analyses. Thus, EPA may "initiate applicable action" under section 6 by soliciting the information needed to complete the analyses necessary to support a section 6(a) rule.

The Request for Comment did just that. It sought information on topics including uses of fluorinated containers that may be critical to the national economy, alternatives to the fluorination process, and possible measures to address risk from PFAS produced during the fluorination of containers. JA45–46. As the Request for Comment explained, EPA will use that information to prepare its analysis of alternatives and to develop compliance dates for any proposed rule, among other uses. JA45. Once those preliminary steps are complete, EPA may proceed to propose a rule under section 6(a) that comports with the requirements of TSCA section 6. *See* 15 U.S.C. § 2605(a), (c)(2), (d).

Because the Request for Comment "set going" the regulatory process prescribed by section 6, EPA has initiated applicable action under that section, which fulfilled any nondiscretionary duty under section 4(f). The district court therefore lacked power to award Plaintiffs any additional relief in this nondiscretionary duty suit, and Plaintiffs' section 4(f) claim is moot.

### C. Plaintiffs' counterarguments fail.

Plaintiffs assert that the Request for Comment and the opening of the publicly accessible docket were insufficient to initiate applicable action within the meaning of section 4(f) and that EPA was instead required to propose a rule imposing risk-reduction measures under section 6(a). Br. 43–44. Plaintiffs make three arguments in support of that view: First, Plaintiffs say that EPA's actions granting the section 21 petition did not "initiate applicable action" because EPA's obligations under section 21 are more limited than its obligations under section 4(f). Second, they assert that section 4(f)'s requirement that EPA "initiate applicable action … to prevent or reduce to a sufficient extent such risk" means that EPA can only initiate applicable action under section 6 by proposing a rule to prevent or reduce risk within the section 4(f) deadline. Third, Plaintiffs argue that EPA was required to proceed directly to proposing a risk management rule in this case because EPA previously ordered Inhance under section 5 to cease manufacture or processing of PFOA and other PFAS. Each argument fails.

1. Plaintiffs argue that EPA's grant of their rulemaking petition did not initiate applicable action because EPA's obligations under section 21 and section 4(f) are different. Br. 40–41. Specifically, Plaintiffs observe that section 4(f) requires EPA to reduce the identified risk "to a sufficient extent,"

whereas section 21 does not. That argument misses the mark because EPA did not initiate applicable action under section 6 by granting Plaintiffs' rulemaking petition. Rather, EPA did so by publishing the Request for Comment and opening the publicly available rulemaking docket. In doing so, EPA also commenced a section 6 proceeding, as it said it would in its response to the rulemaking petition. Thus, by beginning the section 6 process, EPA satisfied its obligations regarding both section 4(f) and the rulemaking petition.

It is immaterial, for purposes of section 4(f), that EPA's actions also responded to a section 21 rulemaking petition. What matters is that EPA has initiated action under section 6. Having done so, the procedural and substantive requirements of that section apply to EPA's subsequent actions, and there is no question that section 6 provides an adequate means for EPA to prevent or reduce risk to a significant extent. *See* 15 U.S.C. § 2605(a) (directing EPA to issue regulations to address "unreasonable risk[s]"). EPA thus fulfilled any obligation to act under section 4(f) when it published the Request for Comment and opened the publicly accessible docket.

2. Plaintiffs argue that EPA cannot initiate applicable action by requesting information because section 4(f) requires EPA to "initiate applicable action ... to prevent or reduce to a sufficient extent" the identified risk. In

Plaintiffs' view, the language requires that the initiating action itself be capable of reducing the risk, Br. 43–44, but that reading fails to consider the plain meaning of "initiate," as well as the structure of the statute.

Plaintiffs' interpretation would transform "initiate" into "propose," but that is not the language Congress chose. In addition, the location of the prepositional phrase setting forth the 180-day deadline shows that it modifies the immediately adjacent verb "initiate," whereas Plaintiffs attempt to shift that deadline to modify the much later infinitive setting forth the purpose of the action. *See* 15 U.S.C. § 2603(f) ("[EPA] shall, within the 180-day period beginning on the date of the receipt of such information, initiate applicable action under [section 5, 6, or 7 of TSCA] to prevent or reduce to a sufficient extent such risk."). Plaintiffs' reading is therefore grammatically incorrect.

Plaintiffs' interpretation also fails to consider statutory structure. Section 4(f) does not independently authorize EPA to take any risk management measures. Instead, it instructs EPA to "initiate applicable action" under one of three statutory provisions that provide EPA with authority to address risks. In turn, each of those provisions contains its own requirements and procedures that EPA must follow. EPA initiates applicable action under those provisions by commencing the process specified in the section under

which EPA chooses to proceed. Indeed, Plaintiffs seem to agree that the requirements of section 6 define the steps required to initiate applicable action under section 4. *See* Br. 44.

As explained above, pp. 6–9, the proposal of a rule prescribing risk management measures is not the first step in the section 6 process. Instead, section 6 requires EPA to undertake a number of analyses, including an economic analysis and an analysis of alternatives. 15 U.S.C. § 2605(a), (c)(2), (d). EPA must then consider those analyses when formulating a proposed rule under section 6(a). *Id.* § 2605(c)(2)(B). Thus, EPA cannot "initiate," *i.e.* "begin," action under section 6 by proposing a rule, without first undertaking the required analyses, because section 6 itself does not authorize it to do so. That section 4(f) requires EPA to initiate action "to prevent or reduce to a sufficient extent" the risk does not change the analysis. *Id.* § 2603(f). That phrase specifies the *outcome* that EPA must pursue, but it does not alter the steps that EPA must take to "initiate" the action under the relevant section, much less effectively eliminate any of those steps.

In any case, a proceeding under section 6 is—by definition—an action that will "reduce the risk to a sufficient extent," as contemplated by section 4(f). If, during the course of a section 6 proceeding, EPA determines that a chemical substance presents an "unreasonable risk," EPA must issue a rule

under section 6(a) that imposes risk management measures "to the extent necessary so that the [chemical substance] no longer presents such risk." *Id.* § 2605(a). Thus, by commencing a proceeding under section 6, EPA will achieve the same end-goal required by section 4(f): the reduction of the risk to a sufficient extent. And Congress clearly considered the section 6 process to be adequate to discharge EPA's obligations under section 4(f) because that is one of the options expressly provided in that section. *Id.* § 2603(f).

Plaintiffs also argue that because section 4(f) allows EPA up to 270 days to initiate applicable action after receiving information that a chemical substance may pose an unreasonable risk, the statute should be construed to require EPA to complete the preparatory steps necessary to propose a section 6 rule during that period. Br. 42 n.10. But that argument is contrary to the text of section 4(f), which allows EPA 180 days (extendable to 270) from the time it receives information to *initiate* action, not to propose a rule.

Nor are Plaintiffs correct that a 180- to 270-day period would be unnecessary if EPA could initiate an action by collecting information necessary to complete that action. The 180-day period begins to run on the date that EPA *receives* information that there may be a reasonable basis to conclude that a chemical substance presents a significant risk of serious or widespread harm to human beings. 15 U.S.C. § 2603(f). That allows EPA only a brief time

to evaluate the information it has received, make an assessment as to whether the information indicates that the substance may present a significant risk or to make a finding that the risk is not unreasonable, and, if EPA determines that there may be a significant risk, to decide whether to initiate action under section 5, 6, or 7.

Indeed, EPA could not realistically complete the preliminary analyses required by section 6 in 270 days, as the deadlines Congress laid out in section 6 make clear. For example, section 6(b)(4)(G) allows EPA up to three and a half years to complete a risk evaluation, and section 6(c)(1) provides a one-year period for EPA to propose risk management measures following the completion of the risk evaluation. Even granting that the actions required by section 4(f) must be accorded high priority, it is unrealistic to think that Congress expected EPA to complete a typically years-long regulatory process in six to nine months. Certainly, the Court should not read such a requirement into the statute without some clearer indication in the text. *See Virginia Uranium v. Warren*, 587 U.S. 761, 765 (2019) ("[I]n any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write.").

3. Finally, Plaintiffs argue that EPA was required in this case to initiate action by proposing a section 6 rule because EPA previously issued orders to

Inhance under section 5. Plaintiffs make two arguments in this regard. First, they say that EPA does not need additional information to undertake the preparatory analyses required by section 6 because it already has sufficient information on PFAS and the fluorination of containers. Br. 46–47. While EPA acquired information on those topics during the section 5 proceedings, that knowledge is insufficient to complete a section 6 rulemaking, which has different procedural and substantive requirements from section 5. As EPA explained in the Request for Comment, the Agency requires additional information on the economic significance of fluorination, the possible effects of various risk management measures, and the availability of alternatives.[6] JA43–45; *see also* 15 U.S.C. § 2605(c)(2)(A)(iv), (c)(2)(C). Unlike section 6, section 5 generally requires EPA to take action "without consideration of

---

[6] Plaintiffs attempt to bolster the allegations in the complaint by relying on the declaration of PEER employee Dr. Kyla Bennett. *E.g.*, Br. 43 n.12. Even if it were proper for Plaintiffs to do so in response to a motion to dismiss, the Bennett declaration gives them no help. Dr. Bennett speculates that the Request for Comment will not provide EPA with any additional information, but she has no basis to know what additional information the Request for Comment might yield, and she appears to discount the possibility that any person or company other than Inhance could have information that would be valuable to EPA. But obviously Inhance's customers could have such information, as could companies that market competitor products. Moreover, Dr. Bennett focuses on information in EPA's possession regarding the risks of PFAS, while failing to acknowledge that EPA must complete economic and alternative analyses before proposing a rule under section 6.

costs or other nonrisk factors." 15 U.S.C. § 2604(e), (f). Nor does section 5 require any analysis of economic effects or alternatives to the proposed regulatory action. *Compare id.* § 2604(e), (f) *with id.* § 2605(c)(2)(A)(iv), (c)(2)(C). Thus, the section 5 proceedings did not require EPA to gather the information necessary to propose a section 6 rule.

Second, Plaintiffs argue that EPA was required to begin by proposing a rule because EPA previously found that the manufacture of three PFAS as a byproduct of the fluorination process presents an unreasonable risk when it issued the section 5 orders, and section 6(a) requires EPA to propose a rule if it finds a chemical substance to present an unreasonable risk. Br. 44–45. Plaintiffs overlook that section 6(a)'s requirement to propose a rule is triggered by a determination made "in accordance with subsection (b)(4)(A)," *i.e.*, a risk evaluation conducted under section 6, and EPA has made no such determination. 15 U.S.C. § 2605(a). Although EPA did complete a risk *assessment* in support of the orders it issued to Inhance under section 5, it has not completed a risk *evaluation* under section 6. *Contra* Br. 22. A section 6 risk evaluation is a different undertaking, with different procedural and substantive requirements. For example, section 6(b)(4)(H) requires EPA to provide an opportunity for public comment on a draft section 6 risk evaluation before publishing a final risk evaluation. Thus, section 6(c)(1)'s requirement

that EPA propose a regulation within one year of determining that a chemical substance poses an unreasonable risk in a section 6 risk evaluation is not triggered by findings made in a section 5 risk assessment. *Contra* Br. 45.

Although the work EPA undertook when preparing the section 5 orders gives the Agency a head start on some of the analyses required by section 6, it is not a substitute for those analyses. EPA's previous actions under section 5 therefore did not change or diminish the steps EPA was required to take to initiate action under section 6.

### D. EPA's reading of section 4(f) would not allow the Agency to "indefinitely ignore" significant risks.

In a last-ditch effort to defeat the plain language of the statute, Plaintiffs make an appeal to policy, arguing that section 4(f) must be read to require EPA to propose a rule within 180 days because otherwise, "EPA could indefinitely ignore the significant risk it identified under Section 4(f), leaving the public without meaningful protection." Br. 43–44.

Appeals to congressional purpose cannot create a nondiscretionary duty that is not contained in the statutory text. *See Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 463 (2022) ("[Courts] are not free to pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal." (quotation omitted)). And in any event, Plaintiffs' concerns are misplaced.

Having fulfilled any nondiscretionary obligation by initiating an action under section 6, EPA committed itself to following the section 6 process to an appropriate conclusion, whether that conclusion is a determination to issue regulations to address an unreasonable risk or a determination that regulation is unnecessary. The Agency set a similar course when it granted Plaintiffs' rulemaking petition.

Plaintiffs have provided little reason to think that EPA will not follow through on that commitment. But if Plaintiffs in the future conclude that EPA is dragging its feet, they may bring an unreasonable delay suit and seek appropriate relief. *See Sierra Club v. Thomas*, 828 F.2d at 794–95. An unreasonable delay suit is not the same as a nondiscretionary duty suit, however. Whereas a nondiscretionary duty suit simply asks whether the agency has performed the task Congress assigned it, an unreasonable delay suit must consider whether the agency's timetable is reasonable under the relevant circumstances. *Id.* at 792; *see also Telecommc'ns Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (providing a list of factors the Court considers when evaluating claims of unreasonable delay). Plaintiffs do not (and cannot) contend that EPA has delayed unreasonably in this case.

And, if Plaintiffs are dissatisfied with EPA's final resolution of the section 6 proceeding, they may seek judicial review. 15 U.S.C. § 2618. Thus, Congress provided Plaintiffs with other avenues for holding EPA to account, and there is no need for the Court to adopt a strained reading of section 4(f) merely to facilitate the statute's asserted purpose.

* * * * *

None of Plaintiffs' arguments casts doubt on what the plain text of section 4(f) requires: that EPA "initiate," *i.e.* "facilitate the first steps of," action under section 5, 6, or, 7. EPA did so when it commenced collection of information necessary to complete the analyses required by section 6, and the district court lacked power to require the Agency to do more.

## II. The district court correctly held that EPA does not have a nondiscretionary duty under section 7.

The district court also correctly dismissed Plaintiffs' claim under section 7(a)(2) because EPA has no nondiscretionary duty under that section. Dismissal was therefore appropriate for lack of jurisdiction because Congress has waived sovereign immunity only for suits to enforce nondiscretionary duties. *Sierra Club v. Wheeler*, 956 F.3d at 618. Alternatively, dismissal was appropriate for failure to state a claim.

**A.**   **Any duty imposed by section 7(a)(2) is not enforceable in a mandatory duty suit because TSCA imposes no deadline on EPA.**

Section 7(a)(2) does not impose a nondiscretionary duty on EPA to commence a judicial action against Inhance for the simple reason that section 7 imposes no date-certain deadline for EPA to take action.

The TSCA citizen suit provision confers jurisdiction on the courts to compel EPA "to compel the Administrator to perform any act or duty under this chapter which is not discretionary," 15 U.S.C. § 2619(a)(2), but it is settled law that such suits may only be brought when the statute imposes a "date-certain deadline" or a deadline that is "readily-ascertainable by reference to some … fixed date or event," *Sierra Club v. Thomas*, 828 F.2d at 790–91; *see also Sierra Club v. Wheeler*, 956 F.3d at 616.

Plaintiffs do not dispute that the text of section 7(a) imposes no date certain deadlines. Nor do they assert that a deadline is readily ascertainable by reference to some fixed date. Instead, Plaintiffs argue that a deadline can be inferred from the deadlines set out in section 4(f), suggesting that Congress might have viewed the "180-day deadline for initiating action on 4(f) chemicals as a logical timeframe" for filing a suit under section 7(a)(2). Br. 53. As explained below, it would be wrong to make such an inference. But even assuming it would be appropriate to import a deadline from section 4(f)

into section 7(a), such an inferred deadline would not create a nondiscretionary duty. Instead, an inferred deadline is "likely to impose merely a 'general duty' of timeliness, one which does not result in per se violations," and general duties of timeliness are not actionable in nondiscretionary duty suits. *Sierra Club*, 828 F.2d at 791. Instead, claims that an agency has violated a general duty of timeliness must be made in a suit alleging unreasonable delay because in such cases "it will be almost impossible to conclude that Congress accords a particular agency action such high priority as to impose upon the agency a categorical mandate that deprives it of all discretion over the timing of its work." *Id.* (quotation and internal alterations omitted).

In any case, an examination of TSCA's text and structure weighs against transposing the section 4(f) deadlines into section 7(a)(2). As to text, nothing in section 7 suggests section 4(f)'s deadlines should govern action under section 7. 15 U.S.C. § 2606. As to structure, section 7 authorizes EPA to bring suits to address "imminent hazards," whereas section 4(f) gives EPA the choice of proceeding under section 5, 6, *or* 7. *Id.* § 2603(f). Plaintiffs' theory attempts to mix-and-match the various statutory provisions, eliminating the disjunctive "or" in 4(f) and reducing EPA's options from three to one, while retaining the statutory deadline from 4(f) which does not appear in section 7. That is not how to read a statute, and this Court should honor

Congress's decision to set a deadline for EPA to act under section 4(f) while setting no such deadline in section 7(a).

Because section 7(a)(2) does not set a deadline for EPA to act, it is not enforceable in a nondiscretionary duty suit, and the district court was correct to dismiss Plaintiffs' second claim.

### B. Any duty imposed by Section 7(a)(2) would only follow proposal of a section 6 rule.

Even if Plaintiffs were correct that a deadline for EPA to take action under section 7(a)(2) were inferable from other provisions of TSCA, EPA is still under no nondiscretionary duty in this case because section 7(a)(2) applies only when EPA has proposed a rule under section 6(a) with regard to an "imminently hazardous chemical substance or mixture" but has declined to make that rule immediately effective as permitted by section 6(d)(3)(A). 15 U.S.C. § 2606(a)(2). Because EPA has not proposed a section 6(a) rule regarding PFAS produced during the fluorination of containers or made the findings required by section 6(d)(3)(A), EPA currently has no duty under section 7(a)(2).

Section 6(d)(3)(A) of TSCA authorizes EPA to make a proposed rule under section 6(a) immediately effective if EPA finds that the manufacture of a chemical substance "is likely to result in an unreasonable risk of serious

or widespread injury to health or the environment … and … making such proposed rule so effective is necessary to protect the public interest." *Id.* § 2605(d)(3)(A)(i). Section 7(a)(2) provides that if EPA proposes a rule and makes the findings required by section 6(d)(3)(A)(i) with regard to an "imminently hazardous chemical substance," but does not make the relevant prosed rule immediately effective, then EPA "shall commence … a civil action" under section 7(a).[7] Taken together, those provisions give EPA a choice when it proposes a section 6 rule addressing an imminently hazardous chemical substance: it can make the proposed rule immediately effective or it can bring a civil action under section 7(a). But EPA has not proposed a rule under section 6(a), nor has EPA made the necessary findings to make such a rule immediately effective. *See Id.* § 2605(d)(3)(A)(i). Thus, EPA currently has no mandatory duty under section 7(a)(2).

Plaintiffs argue that a proposed rule under section 6(a) is not necessary to trigger EPA's obligations under section 7(a)(2), but that its obligation is instead triggered whenever a chemical substance is found to be imminently

---

[7] A nondiscretionary duty could arise only if a substance were determined to be "imminently hazardous." 15 U.S.C. § 2606(a)(2). EPA does not concede that Plaintiffs have pleaded adequate facts to demonstrate that PFAS produced during the fluorination of containers is "imminently hazardous" as that term is defined in section 7(f), but that question was not addressed by the district court there is no need for this Court to reach it.

hazardous. Plaintiffs would re-write section 7(a)(2) to say something like "if EPA finds a chemical substance to be imminently hazardous, then EPA shall commence an action under section 7, unless EPA issues an immediately effective rule under section 6(a) with regard to that substance." *See* Br. 49 ("TSCA states that such suits 'shall' be brought for 'imminently hazardous' chemicals."). But that is not how section 7's conditional clause is structured. As Congress wrote the statute, EPA's obligation to commence a civil action is triggered *if* EPA elects not to make a proposed section 6(a) rule concerning an imminently hazardous substance immediately effective. That, in turn, requires EPA to have proposed a section 6(a) rule, to have determined that the chemical substance is likely to result in an unreasonable risk of serious or widespread injury, and to have declined nonetheless to make the rule immediately effective. *See* 15 U.S.C. § 2605(d)(3)(A)(i)(II) (providing that EPA must also find that making the rule immediately effective is necessary to protect the public interest). Only in those circumstances could section 7(a)(2) require EPA to initiate a civil action under section 7.

In addition to being inconsistent with the text of paragraph 7(a)(2), Plaintiffs' interpretation makes little sense in the context of section 7 as a whole. Paragraph (a)(1) says that EPA *may* commence a civil action with respect to an imminently hazardous chemical substance. The use of the word

"may" indicates that whether to do so is within the discretion of the Administrator. *See Kingdomware Technologies, Inc. v. United States*, 579 U.S. 162, 171–72 (2016). But if Plaintiffs' reading were correct, that discretion would be all but illusory because EPA would be required to commence a civil action regarding any imminently hazardous chemical substance or mixture *unless* it both proposed a section 6(a) rule and made the rule immediately effective. Given the extensive procedures that must precede proposal of a section 6(a) rule, above pp. 6–9, it is implausible that Congress intended section 7(a)(2) to sweep so widely.

Plaintiffs attempt to bolster their strained reading of section 7 by relying on the legislative history, but there is no basis for consulting legislative history when the text and structure of a statue are clear. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history." (quotation omitted)). And in any event, the legislative history is at best inconclusive. The passage Plaintiffs quote essentially re-states the statutory language, saying only that *if* EPA has not used its authority to make a section 6(a) rule regarding an imminently hazardous substance immediately effective, *then* EPA must bring an action under Section 7. Br. 51 (quoting H.R. Report No. 94-

1679 at 78.). As explained above, that language is best read to impose an obligation on EPA to commence a civil action only when EPA has proposed a section 6(a) rule but has declined to make it immediately effective. Indeed, it would be remarkable for Congress to impose a broad mandatory duty on EPA to bring a civil enforcement action—a decision generally regarded as being within the core of Executive discretion, *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)—and for the statutory text and legislative history not to make that intention much more explicit. The legislative history is thus of little help to Plaintiffs.

Section 7(a)(2) could impose a duty on EPA only following the proposal of a section 6(a) rule, but EPA has yet to propose such a rule with respect to PFAS produced during the fluorination of containers. EPA therefore presently has no duty under section 7(a)(2), and Plaintiffs' claim falls outside TSCA's waiver of sovereign immunity. Accordingly, the district court lacked jurisdiction. *Sierra Club v. Wheeler*, 956 F.3d at 618. Alternatively, Plaintiffs fail to state a claim under section 7(a)(2), and dismissal was appropriate on that basis.

## III. Plaintiffs lack Article III standing.

The district court lacked jurisdiction for another reason: Plaintiffs failed to plead facts plausibly alleging Article III standing. The district court

did not address standing because it found that it lacked jurisdiction for the reasons explained above, but this Court may affirm on any ground supported by the record. *Klayman v. Porter*, 104 F.4th 298, 312 (D.C. Cir. 2024). Plaintiffs do not plausibly allege that their employees will suffer cognizable harms or that any harm they do incur would be redressed by a favorable judgment.

"To establish standing, … a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). For standing purposes, the asserted injury "must be actual or imminent, not speculative" and must "affect the plaintiff in a personal and individual way." *Id.* at 381 (quotation omitted). The plaintiff bears the burden to establish each element of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the motion-to-dismiss stage, the court assumes the truth of the well-pleaded allegations in the complaint, but at later stages of the litigation a plaintiff must support those allegations with admissible evidence sufficient to carry its burden. *Id.*

Plaintiffs assert standing not on their own behalf, but on behalf of two of their employees.[8] To establish associational standing, a plaintiff must show that at least one of its members would have standing to sue in his or her own right, that the goals of the suit are germane to the purposes of the organization, and that the participation of the individual member in the suit is not necessary. *Flyers Rts. Educ. Fund, Inc. v. Dep't of Transp.*, 957 F.3d 1359, 1361 (D.C. Cir. 2020). EPA does not dispute that Plaintiffs have pleaded facts sufficient to show that they meet the second and third prongs of the associational standing test.[9]

Plaintiffs' employees, Kyla Bennet and Thomas Fox, allege injuries from past and possible future exposure to PFOA and other PFAS resulting from contact with plastic containers that have been fluorinated by Inhance. Unwanted exposure to a hazardous substance is typically a cognizable injury. *Clean Wis. v. EPA*, 964 F.3d 1145, 1156 (D.C. Cir. 2020). Dr. Bennett's and

---

[8] Plaintiffs do not assert that they have organizational standing, nor could they do so based on harm to their employees. *See All. for Hippocratic Med.*, 602 U.S. at 394–95.

[9] PEER and CEH do not have members but claim associational standing based on two of their senior employees. EPA does not dispute that Plaintiffs have pleaded sufficient facts to show that these employees are "the functional equivalent of members." *Flyers Rts. Educ. Fund*, 957 F.3d at 1361 (quotation omitted).

Mr. Fox's possible past exposures to PFAS are irrelevant to this litigation, however, because TSCA only authorizes prospective relief.[10] Thus, even if Plaintiffs prevail, an order requiring EPA to regulate Inhance's fluorination process would do nothing to redress any harm from those past exposures. *All. for Hippocratic Med.*, 602 U.S. at 381 ("[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury."); *Coal. for Mercury-Free Drugs v. Sebelius*, 671 F.3d 1275, 1279–80 (D.C. Cir. 2012) ("[A] plaintiff who seeks prospective injunctive relief cannot establish standing based on past harm alone."). Plaintiffs' factual allegations must therefore show a "substantial probability" that Dr. Bennett or Mr. Fox will be exposed in the future to PFAS from containers

---

[10] Even if past exposures were relevant, Dr. Bennett's and Mr. Fox's declarations do not show that they have been exposed to fluorinated containers fluorinated in the past. Mr. Fox's allegations are contradictory. He says he has had "continuous contact with plastic containers that are known to be fluorinated based on Inhance's marketing and other materials," ADD10, but elsewhere states that he "lack[s] the ability to determine whether or not the products [he uses] are fluorinated," ADD9. Dr. Bennett's allegations come closer to showing past exposure. For instance, she alleges that a shampoo she previously used is packaged in a distinctively shaped bottle similar to an unmarked bottle displayed in the lobby of an Inhance facility. ADD11. But even her more specific statements show only that she *might* have been exposed to fluorinated containers in the past, and her declaration states that she "trie[s] to eliminate all sources of PFAS from [her] life including by … refraining from contact with plastic as much as possible," making future exposures to those products significantly less likely. ADD39.

fluorinated by Inhance. *Sierra Club v. EPA*, 754 F.3d 995, 1001 (D.C. Cir. 2014).

The key word is "substantial." "Because environmental and health injuries often are purely probabilistic," this Court "has generally required that petitioners claiming increased health risks to establish standing demonstrate a substantial probability that they will be injured." *Sierra Club*, 754 F.3d at 1001 (quoting *Natural Res. Def. Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006)). "In applying the 'substantial' standard, ... the constitutional requirement of imminence necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'" (internal quotation marks and alterations omitted)). *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015). The mere *possibility* of future exposure constitutes nothing more than a generalized grievance, which is insufficient to invoke the jurisdiction of the federal courts. *See Defs. of Wildlife*, 504 U.S. at 573–74 (holding that a plaintiff "seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

Plaintiffs' allegations do not show a substantial probability that they will be exposed personally to PFAS from fluorinated containers. The only company Plaintiffs identify as fluorinating containers is Inhance. Plaintiffs

allege that Inhance fluorinates approximately 200 million containers and other items per year, but they do not allege facts showing that number to be a significant fraction of the billions of plastic containers placed on the U.S. market annually. JA13 (Compl. ¶ 53). And although plaintiffs allege that containers fluorinated by Inhance are used to package particular types of products (*e.g.*, pesticides) or as components in particular durable goods (*e.g.*, fuel tanks for small gasoline engines), they do not allege that Inhance's containers are used exclusively, or even predominantly, in any application. JA18–19 (Compl. ¶¶ 54–55). Further, Plaintiffs allege that alternatives to fluorination are available and used in commerce, meaning that it cannot be assumed a container has been fluorinated merely based on its contents or use. JA190 (Bennett Decl. ¶ 24 (Oct. 10, 2024)). Thus, plaintiffs do not allege facts showing that any product they regularly use is likely to be packaged in a container fluorinated by Inhance. Instead, Plaintiffs rely on the ubiquity of plastic containers, and the fact that some containers are fluorinated by Inhance, to assert that they *may* be at risk of future exposure to PFAS from fluorinated containers in the future.

Those allegations *at best* show that Dr. Bennett or Mr. Fox might encounter a container fluorinated by Inhance in the future and might be exposed to PFAS from contact with that container. But that possibility is far

from the "*substantially* increased risk of harm" necessary to support standing. *Food & Water Watch*, 808 F.3d at 914. If a plaintiff could show injury merely by claiming that she might someday encounter a hazardous product on the market, without making some showing that such encounter is likely, it would all but eliminate the requirement that a plaintiff demonstrate "a personal stake in the outcome of the litigation." *All. for Hippocratic Med.*, 602 U.S. at 379; *see also Food & Water Watch*, 808 F.3d at 915 (holding that "imminence" demands a substantial probability that a risk will materialize). By failing to show such substantial probability, the allegations in the complaint demonstrate nothing more than that Dr. Bennett and Mr. Fox are "concerned bystanders." *All. for Hippocratic Med.*, 602 U.S. at 382. But "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law." *Id.* Because Plaintiffs have failed to show that it is substantially likely Dr. Bennett or Mr. Fox will personally encounter a container fluorinated by Inhance in the future, the have failed to establish Article III standing, and the district court lacked jurisdiction.

## CONCLUSION

For the foregoing reasons, the judgment of the district court dismissing the case for lack of jurisdiction, or alternatively for failure to state a claim, should be affirmed.

Respectfully submitted,

/s/ *Christopher Anderson*

ADAM R.F. GUSTAFSON
  *Acting Assistant Attorney General*

Of Counsel:

ROBERT N. STANDER
  *Deputy Assistant Attorney General*

MAGGIE CLARK
CAMILLE HEYBOER
  *Attorneys*
Office of General Counsel
U.S. Environmental
  Protection Agency

ROBERT P. STOCKMAN
CHRISTOPHER ANDERSON
  *Attorneys*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044

August 22, 2025
90-5-1-4-22816

(202) 353-1834
christopher.anderson3@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 10,844 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Georgia font.

 *s/ Christopher Anderson*
CHRISTOPHER ANDERSON

Counsel for Appellees

# STATUTORY ADDENDUM

TSCA section 4(f), 15 U.S.C. § 2603(f) ........................................................1a

TSCA section 6 (excerpts), 15 U.S.C. § 2605................................................ 2a

TSCA section 7(a), 15 U.S.C. § 2606(a) ..................................................... 11a

TSCA section 20(a), 15 U.S.C. § 2619(a) ...................................................12a

Title 15. Commerce and Trade
  Chapter 53. Toxic Substances Control
    Subchapter I. Control of Toxic Substances

## § 2603. Testing of chemical substances and mixtures

\* \* \*

(f) Required actions

  Upon the receipt of—

  (1) any information required to be submitted under this chapter, or

  (2) any other information available to the Administrator,

which indicates to the Administrator that there may be a reasonable basis to conclude that a chemical substance or mixture presents a significant risk of serious or widespread harm to human beings, the Administrator shall, within the 180-day period beginning on the date of the receipt of such information, initiate applicable action under section 2604, 2605, or 2606 of this title to prevent or reduce to a sufficient extent such risk or publish in the Federal Register a finding, made without consideration of costs or other nonrisk factors, that such risk is not unreasonable. For good cause shown the Administrator may extend such period for an additional period of not more than 90 days. The Administrator shall publish in the Federal Register notice of any such extension and the reasons therefor. A finding by the Administrator that a risk is not unreasonable shall be considered agency action for purposes of judicial review under chapter 7 of Title 5. This subsection shall not take effect until two years after January 1, 1977.

\* \* \*

Title 15. Commerce and Trade
  Chapter 53. Toxic Substances Control
    Subchapter I. Control of Toxic Substances

## § 2605. Prioritization, risk evaluation, and regulation of chemical substances and mixtures

(a)  Scope of regulation

If the Administrator determines in accordance with subsection (b)(4)(A) that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment, the Administrator shall by rule and subject to section 2617 of this title, and in accordance with subsection (c)(2), apply one or more of the following requirements to such substance or mixture to the extent necessary so that the chemical substance or mixture no longer presents such risk:

(1)  A requirement (A) prohibiting or otherwise restricting the manufacturing, processing, or distribution in commerce of such substance or mixture, or (B) limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce.

(2)  A requirement—

(A)  prohibiting or otherwise restricting the manufacture, processing, or distribution in commerce of such substance or mixture for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement, or

(B)  limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement.

(3)  A requirement that such substance or mixture or any article containing such substance or mixture be marked with or accompanied by clear

and adequate minimum warnings and instructions with respect to its use, distribution in commerce, or disposal or with respect to any combination of such activities. The form and content of such minimum warnings and instructions shall be prescribed by the Administrator.

(4) A requirement that manufacturers and processors of such substance or mixture make and retain records of the processes used to manufacture or process such substance or mixture or monitor or conduct tests which are reasonable and necessary to assure compliance with the requirements of any rule applicable under this subsection.

(5) A requirement prohibiting or otherwise regulating any manner or method of commercial use of such substance or mixture.

(6)

(A) A requirement prohibiting or otherwise regulating any manner or method of disposal of such substance or mixture, or of any article containing such substance or mixture, by its manufacturer or processor or by any other person who uses, or disposes of, it for commercial purposes.

(B) A requirement under subparagraph (A) may not require any person to take any action which would be in violation of any law or requirement of, or in effect for, a State or political subdivision, and shall require each person subject to it to notify each State and political subdivision in which a required disposal may occur of such disposal.

(7) A requirement directing manufacturers or processors of such substance or mixture (A) to give notice of such determination to distributors in commerce of such substance or mixture and, to the extent reasonably ascertainable, to other persons in possession of such substance or mixture or exposed to such substance or mixture, (B) to give public notice of such determination, and (C) to replace or repurchase such substance or mixture as elected by the person to which the requirement is directed.

Any requirement (or combination of requirements) imposed under this subsection may be limited in application to specified geographic areas.

* * *

(b)  Risk evaluations

* * *

    (4)  Risk evaluation process and deadlines

       (A)  In general

       The Administrator shall conduct risk evaluations pursuant to this paragraph to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator, under the conditions of use.

       * * *

       (F)  Requirements

       In conducting a risk evaluation under this subsection, the Administrator shall—

          (i)  integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance, including information that is relevant to specific risks of injury to health or the environment and information on potentially exposed or susceptible subpopulations identified as relevant by the Administrator;

          (ii)  describe whether aggregate or sentinel exposures to a chemical substance under the conditions of use were considered, and the basis for that consideration;

          (iii)  not consider costs or other nonrisk factors;

(iv) take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance; and

(v) describe the weight of the scientific evidence for the identified hazard and exposure.

(G) Deadlines

The Administrator—

(i) shall complete a risk evaluation for a chemical substance as soon as practicable, but not later than 3 years after the date on which the Administrator initiates the risk evaluation under subparagraph (C); and

(ii) may extend the deadline for a risk evaluation for not more than 6 months.

(H) Notice and comment

The Administrator shall provide no less than 30 days public notice and an opportunity for comment on a draft risk evaluation prior to publishing a final risk evaluation.

(c) Promulgation of subsection (a) rules

(1) Deadlines

If the Administrator determines that a chemical substance presents an unreasonable risk of injury to health or the environment in accordance with subsection (b)(4)(A), the Administrator—

(A) shall propose in the Federal Register a rule under subsection (a) for the chemical substance not later than 1 year after the date on which the final risk evaluation regarding the chemical substance is published;

(B)  shall publish in the Federal Register a final rule not later than 2 years after the date on which the final risk evaluation regarding the chemical substance is published; and

(C)  may extend the deadlines under this paragraph for not more than 2 years, subject to the condition that the aggregate length of extensions under this subparagraph and subsection (b)(4)(G)(ii) does not exceed 2 years, and subject to the limitation that the Administrator may not extend a deadline for the publication of a proposed or final rule regarding a chemical substance drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments or a chemical substance that, with respect to persistence and bioaccumulation, scores high for 1 and either high or moderate for the other, pursuant to the TSCA Work Plan Chemicals Methods Document published by the Administrator in February 2012 (or a successor scoring system), without adequate public justification that demonstrates, following a review of the information reasonably available to the Administrator, that the Administrator cannot complete the proposed or final rule without additional information regarding the chemical substance.

(2)  Requirements for rule

(A)  Statement of effects

In proposing and promulgating a rule under subsection (a) with respect to a chemical substance or mixture, the Administrator shall consider and publish a statement based on reasonably available information with respect to—

(i)  the effects of the chemical substance or mixture on health and the magnitude of the exposure of human beings to the chemical substance or mixture;

(ii)  the effects of the chemical substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture;

(iii)  the benefits of the chemical substance or mixture for various uses; and

(iv)  the reasonably ascertainable economic consequences of the rule, including consideration of—

(I)  the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health;

(II)  the costs and benefits of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator; and

(III)  the cost effectiveness of the proposed regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator.

(B)  Selecting requirements

In selecting among prohibitions and other restrictions, the Administrator shall factor in, to the extent practicable, the considerations under subparagraph (A) in accordance with subsection (a).

(C)  Consideration of alternatives

Based on the information published under subparagraph (A), in deciding whether to prohibit or restrict in a manner that substantially prevents a specific condition of use of a chemical substance or mixture, and in setting an appropriate transition period for such action, the Administrator shall consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute when the proposed prohibition or other restriction takes effect.

\*  \*  \*

(3)  Procedures

When prescribing a rule under subsection (a) the Administrator shall proceed in accordance with section 553 of title 5 (without regard to any reference in such section to sections 556 and 557 of such title), and shall also—

(A)  publish a notice of proposed rulemaking stating with particularity the reason for the proposed rule;

(B)  allow interested persons to submit written data, views, and arguments, and make all such submissions publicly available;

(C)  promulgate a final rule based on the matter in the rulemaking record; and

(D)  make and publish with the rule the determination described in subsection (a).

(d)  Effective date

(1)  In general.—In any rule under subsection (a), the Administrator shall—

(A)  specify the date on which it shall take effect, which date shall be as soon as practicable;

(B)  except as provided in subparagraphs (C) and (D), specify mandatory compliance dates for all of the requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in a case of a use exempted under subsection (g);

(C)  specify mandatory compliance dates for the start of ban or phaseout requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in the case of a use exempted under subsection (g);

(D)  specify mandatory compliance dates for full implementation of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable; and

(E)  provide for a reasonable transition period.

(2) Variability.—

As determined by the Administrator, the compliance dates established under paragraph (1) may vary for different affected persons.

(3)

(A)  The Administrator may declare a proposed rule under subsection (a) to be effective, and compliance with the proposed requirements to be mandatory, upon publication in the Federal Register of the proposed rule and until the compliance dates applicable to such requirements in a final rule promulgated under section 2605(a) of this title or until the Administrator revokes such proposed rule, in accordance with subparagraph (B), if—

(i)  the Administrator determines that—

(I)  the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or mixture subject to such proposed rule or any combination of such activities is likely to result in an unreasonable risk of serious or widespread injury to health or the environment before such effective date without consideration of costs or other non-risk factors; and

(II)  making such proposed rule so effective is necessary to protect the public interest; and

(ii)  in the case of a proposed rule to prohibit the manufacture, processing, or distribution of a chemical substance or mixture because of the risk determined under clause (i)(I), a court has in an action under section 2606 of this title granted relief with respect to such risk associated with such substance or mixture.

Such a proposed rule which is made so effective shall not, for purposes of judicial review, be considered final agency action.

(B) If the Administrator makes a proposed rule effective upon its publication in the Federal Register, the Administrator shall, as expeditiously as possible, give interested persons prompt notice of such action in accordance with subsection (c), and either promulgate such rule (as proposed or with modifications) or revoke it.

\* \* \*

Title 15. Commerce and Trade
  Chapter 53. Toxic Substances Control
    Subchapter I. Control of Toxic Substances

## § 2606. Imminent hazards

(a) Actions authorized and required

(1) The Administrator may commence a civil action in an appropriate district court of the United States—

(A) for seizure of an imminently hazardous chemical substance or mixture or any article containing such a substance or mixture,

(B) for relief (as authorized by subsection (b)) against any person who manufactures, processes, distributes in commerce, or uses, or disposes of, an imminently hazardous chemical substance or mixture or any article containing such a substance or mixture, or

(C) for both such seizure and relief.

A civil action may be commenced under this paragraph notwithstanding the existence of a determination under section 2604 or 2605 of this title, a rule under section 2603, 2604, or 2605 of this title or subchapter IV, an order under section 2603, 2604, or 2605 of this title or subchapter IV, or a consent agreement under section 2603 of this title, and notwithstanding the pendency of any administrative or judicial proceeding under any provision of this chapter.

(2) If the Administrator has not made a rule under section 2605(a) of this title immediately effective (as authorized by section 2605(d)(3)(A)(i) of this title) with respect to an imminently hazardous chemical substance or mixture, the Administrator shall commence in a district court of the United States with respect to such substance or mixture or article containing such substance or mixture a civil action described in subparagraph (A), (B), or (C) of paragraph (1).

\*  \*  \*

Title 15. Commerce and Trade
  Chapter 53. Toxic Substances Control
    Subchapter I. Control of Toxic Substances

## § 2619. Citizens' civil actions

(a)  In general

Except as provided in subsection (b), any person may commence a civil action—

(1)  against any person (including (A) the United States, and (B) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of this chapter or any rule promulgated under section 2603, 2604, or 2605 of this title, or subchapter II or IV, or order issued under section 2603 or 2604 of this title or subchapter II or IV to restrain such violation, or

(2)  against the Administrator to compel the Administrator to perform any act or duty under this chapter which is not discretionary.

Any civil action under paragraph (1) shall be brought in the United States district court for the district in which the alleged violation occurred or in which the defendant resides or in which the defendant's principal place of business is located. Any action brought under paragraph (2) shall be brought in the United States District Court for the District of Columbia, or the United States district court for the judicial district in which the plaintiff is domiciled. The district courts of the United States shall have jurisdiction over suits brought under this section, without regard to the amount in controversy or the citizenship of the parties. In any civil action under this subsection process may be served on a defendant in any judicial district in which the defendant resides or may be found and subpoenas for witnesses may be served in any judicial district.

  *   *   *