# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 21, 2025                    Decided May 1, 2026

No. 24-5294

PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY
AND CENTER FOR ENVIRONMENTAL HEALTH,
APPELLANTS

v.

LEE M. ZELDIN, AS ADMINISTRATOR OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY AND ENVIRONMENTAL
PROTECTION AGENCY,
APPELLEES

INHANCE TECHNOLOGIES LLC,
INTERVENOR

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:24-cv-02194)

———

*Robert M. Sussman* argued the cause for appellants. With him on the briefs was *Paula Dinerstein*.

*Christopher Anderson*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief

2

were *Adam R.F. Gustafson*, Acting Assistant Attorney General, *Robert N. Stander*, Deputy Assistant Attorney General, and *Robert P. Stockman*, Attorney.

*Jessica L. Ellsworth* argued the cause for intervenor in support of appellees. With her on the brief were *J. Tom Boer*, *Susan M. Cook*, *Marlan Golden*, and *J. Andrew Mackenzie*. *Catherine E. Stetson* entered an appearance.

Before: PILLARD and WALKER, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This case involves an action under the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 *et seq.*, filed in the District Court by Appellants, Public Employees for Environmental Responsibility ("PEER") and Center for Environmental Health ("CEH"), against the Environmental Protection Agency ("EPA"). Appellants allege that EPA has failed in its responsibilities under TSCA to address risks associated with perfluorooctanoic acid ("PFOA"), one of a class of per- and polyfluoroalkyl substances ("PFAS"), formed during the fluorination of plastic containers.

Appellants' complaint focuses on TSCA section 4(f), *id.* § 2603(f), which requires EPA to "initiate applicable action" within 180 days of receiving information "which indicates to the [agency] that there may be a reasonable basis to conclude that a chemical substance or mixture presents a significant risk of serious or widespread harm to human beings." Appellants allege that EPA possessed damning information regarding the risks of PFOA by March 29, 2023 and that the information was

3

sufficient to trigger the agency's obligation to act under section 4(f). In the alternative, Appellants invoke TSCA section 7(a)(2), *id.* § 2606(a)(2), to argue that EPA has a nondiscretionary duty to bring an enforcement action to abate an imminent hazard posed by PFOA generated by Appellee-Intervenor Inhance Technologies, LLC ("Inhance"), a company engaged in the fluorination process.

The District Court dismissed the case for two principal reasons. First, the court held that EPA had fulfilled any nondiscretionary duty under section 4(f) by publishing a request for comment, rendering Appellants' primary claim moot. *See Pub. Emps. for Env't Resp. v. Regan*, 2024 WL 5075828, at *4-5 (D.D.C. Dec. 11, 2024). Second, the court expressed skepticism that section 7(a)(2) imposes on EPA a nondiscretionary duty to bring an enforcement action, and, even if it did, the court found that duty had not been triggered. *Id.* at *5-6. The District Court thus concluded that Appellants' claim "falls outside the terms of . . . TSCA's citizen-suit provision." *Id.* at *6.

We affirm, but on grounds different from those relied upon by the District Court. On the record before us, we conclude that the complaint filed by PEER and CEH must be dismissed because Appellants have failed to establish that they have associational standing upon which PEER and CEH rely in pursuing this action in federal court.

To establish associational standing, an organization must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Implicit in the first prong

4

of the *Hunt* test is that the organization "has either members or any equivalent affiliates." *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002). As we explain below, PEER and CEH have failed to make the requisite allegations to establish their standing.

The Supreme Court has long recognized that "an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). This form of associational standing is always available to a traditional "voluntary membership organization" that "has identified members and represents them in good faith." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023). Alternatively, an organization may assert associational standing if it demonstrates that it "is the functional equivalent of a traditional membership organization." *Fund Democracy*, 278 F.3d at 25. Appellants have not made either showing.

Appellants are concededly not traditional membership organizations. And to be the functional equivalent of a membership organization, a group must be "sufficiently identified with and subject to the influence of those it seeks to represent." *Flyers Rts. Educ. Fund, Inc. v. U.S. DOT*, 957 F.3d 1359, 1362 (D.C. Cir. 2020) (citation omitted). Appellants seek to represent PEER and CEH's "[b]oard members, supporters[,] and staff." Compl. ¶ 29, Joint Appendix ("J.A.") 13. But PEER and CEH have "given us no insight" into how either organization relates with these purported supporters. *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022). Indeed, there is nothing in Appellants' Complaint or in the evidence presented to the District Court that supports PEER and CEH's claims of associational standing.

5

Neither this court nor the Supreme Court has ever adopted such an expansive conception of associational standing pursuant to which an employee's influence over her employing organization suffices to make her the "functional equivalent" of a member on whose behalf the organization may assert associational standing.

Associational standing rests on the assumption that there is a meaningful alignment of an organization's interests and the interests of a constituency that the organization seeks to protect. Under *Hunt*, that alignment is demonstrated where the organization's purpose is to advance the interests of its members, those members are the primary beneficiaries of its activities, and the organization is sufficiently subject to their influence to ensure it represents their views. *See Hunt,* 432 U.S. at 344-45; *see also Flyers Rts.*, 957 F.3d at 1362. This framework preserves the sanctity of the relationship between an organization and its members that justifies an organization suing as the representative of its members.

Appellants' theory of standing in this case departs from these settled principles. Neither PEER nor CEH claims that its purpose is to serve its employees, nor that its employees are the primary beneficiaries of its work. Nor are the organizations meaningfully subject to their employees' influence in the relevant sense. Any influence PEER and CEH's employees wield arises from their roles as employees obligated to carry out organizational objectives, not as constituents whose interests the organizations exist to represent. Employees, in this structure, are the means by which the organizations act, not the constituency whose interests define those actions. Treating PEER and CEH's employees as "members" would collapse the distinction between representative and represented that *Hunt* presupposes.

6

We therefore decline to extend associational standing to encompass PEER and CEH's employees acting in their capacity as employees. Accordingly, we dismiss this action for lack of jurisdiction because Appellants have failed to establish their standing.

## I. BACKGROUND

### A.  *Factual and Regulatory Background*

Congress enacted TSCA in 1976 to protect against chemical substances that "present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601(b)(2). To achieve that objective, TSCA authorizes EPA to regulate chemical substances that pose such risks. For example, EPA may restrict or prohibit such chemicals through rulemaking under section 6. *See id.* § 2605. Where risks are more immediate, TSCA provides an additional complementary mechanism: under section 7, EPA "may commence a civil action in an appropriate district court" to address "imminently hazardous" substances. *Id.* § 2606(a)(1). Section 7 also directs EPA to "commence" appropriate action in a district court if EPA "has not made a rule under [section 6] immediately effective . . . with respect to an imminently hazardous chemical substance." *Id.* § 2606(a)(2).

Additionally, TSCA contains an action-forcing provision, section 4(f), which requires EPA, within 180 days of receiving information indicating that a chemical "presents a significant risk of serious or widespread harm to human beings," to either "initiate applicable action" under relevant TSCA sections "to prevent or reduce to a sufficient extent such risk" or publish a finding that the risk is not unreasonable. *Id.* § 2603(f). In addition, TSCA section 20 authorizes citizen suits to compel

7

EPA's administrator "to perform any act or duty under this chapter which is not discretionary." *Id*. § 2619(a)(2).

Appellants allege that, by March 29, 2023, EPA possessed "conclusive data demonstrating that PFOA (i) is carcinogenic to humans and has no safe level of exposure and (ii) is present in tens of millions of plastic containers . . . distributed and used throughout the economy." Compl. ¶ 113, J.A. 32. They allege that receipt of such data triggered EPA's nondiscretionary duty under TSCA section 4(f) to "initiate applicable action . . . to prevent or reduce . . . to a sufficient extent" the risks posed by PFOA formation. *Id.* ¶ 115, J.A. 32 (citation omitted); *see also id.* ¶¶ 113-114, 116, J.A. 32.

Discontent with EPA's response to these risks, Appellants and other interested parties petitioned EPA on April 11, 2024, to initiate rulemaking under TSCA section 6 to prohibit the manufacture and distribution of PFAS, including PFOA, generated during container fluorination.

EPA granted the petition on July 10, 2024, stating that "the agency will promptly commence an appropriate proceeding under TSCA section 6 associated with the formation of PFOA [and two other PFAS] during the fluorination of plastic containers." J.A. 40 (cleaned up). EPA added that "[a]s part of that proceeding, [it] intends to request information" regarding the use of fluorinated containers, available alternatives, and measures to address the risks posed by these chemicals. *Id.*

EPA followed through on that commitment on September 30, 2024 by publishing a notice in the Federal Register requesting public comment on the risks associated with PFAS formation during fluorination, the prevalence and uses of fluorinated containers, potential alternatives to fluorination, and possible regulatory measures.

8

### B. *Procedural History*

Appellants filed this citizen suit under TSCA section 20 in the District Court on July 25, 2024, two weeks after EPA granted their rulemaking petition and before EPA published the request for comment. Appellants allege that EPA failed to perform its nondiscretionary duty under TSCA section 4(f) to initiate substantive regulatory action within 180 days of receiving information concerning the risks posed by PFOA. In their view, neither granting a rulemaking petition nor soliciting public comment satisfies that obligation. Appellants also allege that EPA was required under TSCA section 7 to commence a civil action for injunctive relief against Inhance.

EPA moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The District Court granted EPA's motion. *See Pub. Emps. for Env't Resp. v. Regan*, 2024 WL 5075828 (D.D.C. Dec. 11, 2024). Beginning with Appellants' section 4(f) claim, the court first assumed, for the purposes of deciding the motion, that EPA was under a nondiscretionary duty to take applicable action no later than 180 days after March 29, 2023. However, the District Court found that EPA had fulfilled that obligation by publishing the request for comment, which was "explicitly designed to inform the Agency's regulation of the relevant PFAS." *Id.* at *4 (cleaned up). Thus, EPA had "kickstart[ed] the information-gathering process, and . . . successfully completed the necessary first step of any rulemaking." *Id.* Accordingly, the District Court held that it lacked the power to award Appellants effective relief on their section 4(f) claim and that the claim was therefore moot.

Turning to Appellants' second claim, the District Court expressed doubt that section 7 imposes a nondiscretionary duty "given the lack of a deadline that is 'date-certain' or 'readily-

9

ascertainable by reference to some other fixed date or event.'" *Id.* at \*5 (quoting *Sierra Club v. Thomas*, 828 F.2d 783, 790-91 (D.C. Cir. 1987)). But even assuming that section 7 imposes a nondiscretionary duty, the court explained that no such duty had arisen in this case because that duty is triggered only after EPA proposes a section 6 rule and declines to make the rule immediately effective. EPA had not proposed such a rule, and, thus, it was under no mandatory duty to act. Accordingly, the District Court dismissed Appellants' section 7 claim, concluding that it "falls outside the terms of . . . TSCA's . . . 'limited waiver of the federal government's sovereign immunity.'" *Id.* at \*6 (quoting *Physicians Comm. for Responsible Med. v. Horinko*, 285 F. Supp. 2d 430, 441 (S.D.N.Y. 2003)). Appellants timely petition for this court's review.

## II. ANALYSIS

"[A] showing of standing 'is an essential and unchanging' predicate to any exercise of our jurisdiction." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The party invoking federal jurisdiction bears the burden of" satisfying the court that it has standing to proceed. *Lujan*, 504 U.S. at 561. At the pleading stage, "[t]he question . . . is whether plaintiffs have plausibly alleged standing." *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C. Cir. 2019). At this posture, "'we accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor,' but we do not assume the truth of legal conclusions or accept inferences that are unsupported by the facts alleged in the complaint." *Id.* (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)). As noted above, we find that Appellants have failed to

10

plausibly allege that either PEER or CEH has standing. Therefore, we must dismiss for lack of jurisdiction.

## A. *Associational Standing*

Because Appellants are organizations, they can satisfy "the standing requirements of Article III . . . in two ways." *Students for Fair Admissions*, 600 U.S. at 199. First, they "can claim that [they] suffered an injury in [their] own right." *Id.* Second, they can claim "associational standing" as the representatives of their members. *Hunt*, 432 U.S. at 343. Appellants assert this latter theory of "associational" or "representative" standing.

The Supreme Court has long recognized that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth*, 422 U.S. at 511 (citing *Nat'l Motor Freight Traffic Ass'n, Inc. v. United States*, 372 U.S. 246 (1963) (per curiam)). At the same time, the Court has been equally clear that "[t]he possibility of such representational standing . . . does not eliminate or attenuate the constitutional requirement of a case or controversy." *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 727 (1972)). In *Warth*, the Supreme Court enumerated certain requirements for an association "to invoke the court's jurisdiction" as the representative of its members:

> The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to

11

proper resolution of the cause, the association may be an appropriate representative of its members.

*Id.* (citation omitted).

The Supreme Court distilled these requirements in *Hunt*. There, the Court explained that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343.

Both Appellants fail at the threshold. "[I]mplicit in the three-part test articulated in *Hunt*" is "[t]he assumption that an organization litigates on behalf of its *members*." *Am. Legal Found. ("ALF") v. FCC*, 808 F.2d 84, 89 (D.C. Cir. 1987) (emphasis added). Accordingly, associational standing is typically claimed by traditional membership organizations with "common arrangements such as professional associations, labor unions, social clubs and the like." *Flyers Rts.*, 957 F.3d at 1361. However, as explained in the introduction to this opinion, an organization may also assert associational standing if it demonstrates that it "is the functional equivalent of a traditional membership organization." *Fund Democracy*, 278 F.3d at 25 (citing *Hunt*, 432 U.S. at 342-45). Yet, neither Appellant has plausibly pled that it "has either members or any equivalent affiliates." *Id.*

"In determining whether [Appellants] have standing, the court may not consider on appeal supplemental declarations filed after entry of the judgment appealed." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015). "This court and our sister circuits generally have held that declarations that

12

were not part of the record before the district court at the time of a judgment or order are not part of the record on appeal of that judgment or order." *Id.* (compiling cases). Accordingly, we cannot consider the standing declarations that Appellants submitted for the first time on appeal. Having reviewed the materials that are properly before us, we find that Appellants have not plausibly established that either PEER or CEH has standing to represent the interests of PEER and CEH's "[b]oard members, supporters[,] and staff." Compl. ¶ 29, J.A. 13.

Appellants concede that they are "not traditional membership organizations." Br. of Appellants 28. Instead, they claim that PEER and CEH are the functional equivalent of such organizations based on their relationships with those they seek to represent, *i.e.*, "their supporters, staff[,] and Boards of Directors." *Id.* But Appellants do not suggest that PEER's or CEH's supporters have the requisite roles, responsibilities, or influence over the organizations to alone satisfy the strictures of associational standing. To the extent they gesture toward that position on reply, the argument comes too late. *See Fore River Residents Against the Compressor Station v. FERC*, 77 F.4th 882, 889 (D.C. Cir. 2023) ("Arguments raised for the first time in a reply brief are forfeited."). Additionally, although Appellants, in passing, mention each organization's Board of Directors as part of their claims to associational standing, they do not develop the theory sufficiently to preserve it for our review. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.").

We are thus left with Appellants' concededly novel theory that their *employees*' influence derived from their responsibilities and roles at PEER and CEH suffice to make them the "functional equivalents" of members on whose behalf

13

the organizations may assert associational standing. Even if we assume that some employees have some degree of influence based on "their responsibilities and roles in the organization[s]," Br. of Appellants 28, this is insufficient to show that Appellants have associational standing.

## B. *Requirements for a Functional Equivalent of a Traditional Membership Organization*

To assess whether an organization is the functional equivalent of a traditional membership organization, this court looks to the Supreme Court's seminal decision in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977). *See, e.g.*, *Fund Democracy*, 278 F.3d at 25. In *Hunt*, the Court held that a state commission – which was not a "traditional voluntary membership organization" – had standing to assert the claims of its constituency of apple growers and dealers. 432 U.S. at 344. The Court offered three reasons in support of this conclusion. *First*, the commission's "purpose [was] the protection and promotion of the" state's apple growers and dealers. *Id.* "It thus serve[d] a specialized segment of the [s]tate's economic community which [was] the primary beneficiary of its activities, including the prosecution of this kind of litigation." *Id. Second*, the apple growers and dealers, in turn, "possess[ed] all of the indicia of membership in an organization." *Id.* "They alone elect[ed] the members of the [c]ommission; they alone [could] serve on the [c]ommission; they alone finance[d] its activities." *Id.* Thus, "[i]n a very real sense, . . . the [c]ommission represent[ed] the [s]tate's growers and dealers and provide[d] the means by which they express[ed] their collective views and protect[ed] their collective interests." *Id.* at 345. *Third*, the interests of the commission were closely tied to those of its constituency in the pending litigation. *See id.*

14

This court's application of *Hunt* in *American Legal Foundation* is instructive. We held that ALF, a "media watchdog" group, could not assert associational standing on behalf of members of the public who regularly consume news broadcasts. *ALF*, 808 F.2d at 90. The court found that ALF could not satisfy the first prong of *Hunt* because it "serve[d] no discrete, stable group of persons with a definable set of common interests." *Id.* Rather, the court explained, "ALF's constituency of supporters is completely open-ended" and could conceivably include "all who read newspapers, watch television, or listen to the radio." *Id.* Turning to *Hunt*'s second prong, ALF failed to satisfy the court that its "'supporters' play[ed] any role in selecting ALF's leadership, guiding ALF's activities, or financing those activities." *Id.* ALF also failed the third prong of *Hunt* because "a definable membership body whose resources and wishes help steer the organization's course" is a prerequisite to ensuring the organization's fortunes are tied to those of its constituency. *Id.*

Following *Hunt* and *American Legal Foundation*, this court has declined claims of associational standing based on an organization's "past work with various groups of individual investors," *Fund Democracy*, 278 F.3d at 25, and a magazine's relationship with its "readers and subscribers," *see Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002). We have also rejected claims of associational standing where it was "unclear" whether the organization was "the sort of organization that would qualify as a 'membership association' for purposes of our standing analysis." *Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018) (citation omitted); *see also, e.g.*, *Viasat*, 47 F.4th at 782 (denying associational standing where the organization provided "no basis to determine whether the requisite elements of standing have been met").

15

Here, too, Appellants fail to satisfy the requirements of associational standing under *Hunt* and its progeny.

### C. Appellants Fail to Establish that PEER or CEH Is the Functional Equivalent of a Traditional Membership Organization

As discussed, Appellants argue that PEER and CEH have standing to represent the interests of their employees, supporters, and Boards of Directors "based on their [employees'] responsibilities and roles in the organization." Br. of Appellants 28. However, this court has never held that such influence suffices to make an employee the "functional equivalent" of a member on whose behalf the organization may assert associational standing. For the reasons discussed below, we decline to do so here.

*First*, PEER and CEH cannot claim their employees as "members" under the first prong of *Hunt*. In *Hunt*, the state commission satisfied the inquiry because "its purpose [was] the protection and promotion of the" state's apple growers and dealers, who were, in turn, "the primary beneficiary of its activities." 432 U.S. at 344. Here, by contrast, neither PEER nor CEH claims that its purpose is to advance the interests of its employees as such, nor that its employees are the primary beneficiaries of its work. Rather, PEER purports to "speak[] on behalf of environmental and public health professionals, land managers, scientists, enforcement officers, and other civil servants dedicated to upholding environmental laws and values." Compl. ¶ 31, J.A. 13-14. Meanwhile, CEH claims to "work to protect people and the environment from toxic chemicals by engaging with communities, consumers, workers, government, and the private sector to demand and support business practices that are safe for public and environmental health." *Id.* ¶ 26, J.A. 12.

16

In neither case are employees the constituency whose interests define the organization's mission. Nor could they be. Employees serve as the means by which an organization acts, not the constituency it represents. Treating them as "members" would collapse the distinction between representative (the organization and its agents) and represented (the members) that *Hunt* presupposes.

Without any sort of distinction between representative and represented, Appellants' claimed membership also suffers the defect identified in *American Legal Foundation*. There, this court found that the "media watchdog" group's "constituency of supporters" was too "open-ended" because it "could, consistent with [its] 'institutional commitment,' purport to serve all who read newspapers, watch television, or listen to the radio." *ALF*, 808 F.2d at 90. In this case, Appellants have not identified any distinct group of "supporters" who might reflect a constituency. And extending PEER and CEH's already broad institutional commitments to the "public" to also include their own employees would render any purported constituency even more incoherent. In sum, on the record before the court, we conclude that PEER and CEH do not serve a "discrete, stable group of persons with a definable set of common interests," *id.*, so as to plausibly support a claim for associational standing.

*Second*, Appellants cannot rely on their employees' influence over their employing organizations to satisfy the second prong of *Hunt*. Appellants argue that PEER and CEH satisfy the "indicia of membership" inquiry because they are "sufficiently identified with and subject to the influence of those they seek to represent, even though they do not possess all three indicia of membership considered in *Hunt*." Appellants' Reply Br. 22 (cleaned up) (quoting *Flyers Rts.*, 957 F.3d at 1362). But the relevant inquiry is not whether individuals exert some influence over the organization; it is

17

whether the organization is subject to the influence of a constituency whose interests it exists to represent. *See Flyers Rts.*, 957 F.3d at 1362. That condition is not met here. Any influence PEER and CEH's employees exercise arises from their roles as employees charged with carrying out organizational objectives, not from their status as an independent constituency to whose interests the organizations are accountable. Influence exercised in service of the organization's mission is not the kind of member-driven control that *Hunt* contemplates. *See* 432 U.S. at 344-45 (evaluating whether the commission "represents [its constituents] and provides the means by which [its constituents] express *their* collective views and protect *their* collective interests" (emphasis added)). And, as discussed, Appellants have not "given us . . . insight" into how either organization relates with its purported supporters. *Viasat*, 47 F.4th at 781.

*Last*, as this court observed in *American Legal Foundation*, a "definable membership body whose resources and wishes help steer the organization's course" is a prerequisite to establishing a "linkage between [the organization's] interest in the outcome of this kind of litigation and those of its supporters." 808 F.2d at 90. Here, as discussed under the first two prongs, Appellants have not established that either PEER or CEH has a "definable membership body whose resources and wishes help steer the organization's course." Under these circumstances, it seems likely that PEER and CEH will "have reasons for instituting a suit . . . other than to assert rights of" their supporters. *Id.* (quoting *Telecomms. Rsch. & Action Ctr. v. Allnet Commc'n Servs., Inc.*, 806 F.2d 1093, 1096 (D.C. Cir. 1986)). Where such concerns are present, "we cannot conclude, as could the *Hunt* Court, that the organization[s] before us [are] the

18

functional equivalent[s] of . . . traditional membership organization[s]." *Id.*

In *American Legal Foundation*, our court "counsel[ed] restraint in straying from the framework of associational standing crafted in *Hunt*, even assuming we were at liberty to do so." *Id.* at 91. The same considerations still militate against an untethered application of *Hunt*. At the time *American Legal Foundation* was decided, the Supreme Court had recently "reaffirmed the principles [of associational standing] elaborated in *Hunt*" in *United Automobile Workers v. Brock*, 477 U.S. 274 (1986). *ALF*, 808 F.2d at 91. This court had also "recently rejected an invitation to relax the requirements for associational standing articulated in *Hunt* when doing so would undermine the 'theoretical identity' between organizations and individuals on which associational standing is based." *Id.* (citing *Telecomms. Rsch. & Action Ctr.*, 806 F.2d at 1095).

Forty years later, associational standing is so "consistently applie[d]" and established within our jurisprudence that challenges to it concern "only the finer points of its operation." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 405 (2024) (Thomas, J., concurring). At the same time, this court has consistently adhered to *Hunt*'s limits. *See, e.g.*, *Viasat*, 47 F.4th at 781-82; *Sorenson Commc'ns*, 897 F.3d at 225; *Gettman*, 290 F.3d at 435; *Fund Democracy*, 278 F.3d at 25-26. Here, too, Appellants fall short of *Hunt*'s requirements. Thus, permitting PEER and CEH to proceed would "undermine the 'theoretical identity' between organizations and individuals on which associational standing is based." *ALF*, 808 F.2d at 91. Although the organizations may be closely aligned with their employees in an operational sense, they are not identified with them in the representational sense that *Hunt* requires.

19

### III. CONCLUSION

For the reasons stated above, we affirm the District Court's order dismissing the case.

*So ordered.*